The RIGGS NATIONAL BANK OF WASHINGTON, D. C., Plaintiff,

v.

Joe L. ALLBRITTON, et al., Defendants.

Civ. A. No. 81–0445.

United States District Court, District of Columbia.

March 17, 1981.

Fred M. Vinson, C. Roger Nelson, Washington, D. C., for plaintiff.

C. Benjamin Crisman, Jr., Stuart L. Shapiro, Jeffrey Glekel, Washington, D. C., for defendants.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

This matter is before the Court upon the motion of the plaintiff, Riggs National Bank of Washington, D. C., ("Riggs") for a preliminary injunction, enjoining defendants Joe L. Allbritton, Pierce National Life Insurance Company ("Pierce"), University Bancshares, Inc. ("University") and Perpetual Corporation ("Perpetual") from continuing with or effectuating the cash tender offer for shares of Riggs stock heretofore commenced by defendant Allbritton, acquiring or attempting to acquire in any manner any shares of Riggs stock, and other actions related to the acquisition and use of shares of such stock.[1] Upon the application of the plaintiff and after oral argument by counsel for the parties, on February 26, 1981, the Court issued a Temporary Restraining Order enjoining defendants from continuing with or effectuating the tender offer of Riggs stock commenced by defendant Allbritton, and certain related acts, pending a hearing on the motion for preliminary injunction.

Upon consideration of the plaintiff's motion for a preliminary injunction, the memoranda of points and authorities in support thereof and in opposition thereto, the evidence adduced at the hearing on this matter, the oral arguments of counsel for the parties, the record before the Court, and for the reasons more fully set forth below, the Court will grant the motion of the plaintiff, the Riggs National Bank of Washington, D. C. for a preliminary injunction enjoining

defendants from proceeding with the tender offer.

## BACKGROUND OF THE LITIGATION

The plaintiff Riggs is a national banking association, conducting general commercial banking and trust business in the District of Columbia. The record establishes that there are 2,992,131 shares of Riggs common stock outstanding, and that the stock is publicly traded in the over-the-counter market. Defendant Allbritton is Chairman of the Board and a director of defendant Pierce, a California corporation with its principal place of business in Los Angeles, California; defendant University, a Texas corporation with its principal place of business in Houston, Texas; and defendant Perpetual, a Delaware corporation with its principal place of business in Houston, Texas. Perpetual owns all of the capital stock of Pierce and both University and Perpetual are wholly-owned by defendant Allbritton. At the time the complaint was filed, Allbritton owned 237,645 shares of Riggs common stock, representing approximately 7.9% of the outstanding shares, and University and Pierce owned 149,000 shares (5.0%) and 63,770 shares (2.1%), respectively. Pierce acquired its shares in open market transactions during late 1979 and early 1980, while Allbritton and University acquired their 386,645 shares pursuant to an agreement executed on December 3, 1980, between them and certain shareholders affiliated with Jorge E. Carnicero ("Carnicero Purchase"), a director of Riggs. The purchase of these shares was completed on January 22, 1981. However, the record reflects that on or about February 27, 1981, Allbritton purchased all of the shares owned by University. Together, the defendants Allbritton and Pierce now own 450,415 shares of Riggs stock or approximately 15% of the outstanding shares as of December 1980.

1. Plaintiff also asks the Court to enjoin defendants from (1) soliciting or arranging for the solicitation of orders to sell any shares of Riggs stock; (2) preventing or attempting to prevent the withdrawal of any shares of Riggs stock heretofore tendered pursuant to the Offer; (3) using or attempting to use any shares of Riggs stock as a means of controlling or influencing the management or policies of Riggs; (4) voting, in person or by proxy, any shares of Riggs previously acquired; and (5) exercising or attempting to exercise, directly or indirectly, any influence upon the management and policies of Riggs.

On February 9, 1981, Allbritton publicly announced a cash tender offer ("Offer") for 600,000 shares of Riggs common stock at a price of $67.50 per share. The Offer to Purchase indicates an expiration date of March 10, 1981, at 10:00 a. m., New York City time, unless extended,[2] and that the Offer is not conditioned upon any minimum number of shares being tendered. The Offer provides that the Purchaser reserves the right to elect to purchase more than 600,000 shares and contains provisions for the purchase of shares on a pro rata basis under certain circumstances. Under the terms of the Offer, all tenders are irrevocable, except that shares tendered may be withdrawn prior to the date the Purchaser intends to commence purchasing, which was to have been March 3, 1981,[3] and after April 9, 1981. The Offer states as its purpose the acquisition of a substantial equity interest in the Bank with the power to control or to influence control over the Bank. It is undisputed that if the 600,000 shares are purchased, the Purchaser and his affiliates will own approximately 35% of the outstanding shares of Riggs and that this percentage of shares may constitute effective control of the Bank by the Purchaser.

## CONTENTIONS OF THE PLAINTIFF

In the complaint in this action filed on February 24, 1981, the plaintiff Riggs National Bank contends that the Offer fails to disclose material information in violation of Section 14(e) of the Securities Exchange Act of 1934 ("1934 Act"),[4] and in particular, the antifraud provision of the Williams Act, 15 U.S.C. § 78n(e) which provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation.

Riggs argues the Offer to Purchase contains no information concerning the financial condition of defendant Allbritton, the other named-defendants, or any other of his affiliated corporations, including financial statements, and cash flow and capitalization statements. This failure, it is argued, deprives the shareholders of material information concerning the consequences of the offer and the defendants' ability to repay the loans to be incurred for the purchase.

The plaintiff reasons that since all Riggs stock acquired by Allbritton will be used as security for his loans for the purchase, his ability to repay the loans and the manner in which it is feasible for him to do so may well be of major consequence to the future of Riggs. Thus, information concerning the personal finances of Allbritton are indeed material to a shareholder's investment decision. Plaintiff urges that defendants are required to disclose and to file financial statements, preferably audited, on some combining or consolidating basis which would reflect the intricate relationships between Allbritton and his affiliate corporations. The plaintiff further submits the Offer fails to reveal the fact that the formation of a bank holding company ("Holding Company Transaction"), which is the subject of a proxy solicitation filed on February 6, 1981, and a matter to be voted upon at the April 22, 1981, shareholder's meeting, will cause the default of the loans to be incurred by Allbritton in the purchase of the offered shares. Such default could result in grievous harm to Riggs shareholders by the rapid decline in the market value of Riggs stock which would be occasioned by a

---

**2.** By Order of this Court dated March 12, 1981, the Offer has been extended until 12:00 noon, March 17, 1981.

**3.** The Temporary Restraining Order issued on February 26, 1981, enjoined the purchase by Allbritton of tendered shares.

**4.** Pursuant to Section 12(i) of the 1934 Act, 15 U.S.C. § 78*l*(i), the disclosure requirements of the 1934 Act are in general, administered by the Comptroller of the Currency in the case of national banks, pursuant to regulations promulgated by the Comptroller.

forced sale of Allbritton's shares. Plaintiff advances that this information is material to a shareholder who must decide whether to sell, hold, or tender his shares of Riggs stock.

Plaintiff alleges in its complaint that while the Offer states that Allbritton is opposed to the Holding Company Transaction initiated by the present management of Riggs, the materials fail to state the reasons for such opposition or to set forth any information with respect to the proposed transaction. Plaintiff asserts that while the Offer reflects that Allbritton might favor a different form of holding company transaction and that he has considered and will continue to consider various alternative structures with regard to a holding company for Riggs, it fails to disclose any further information concerning these considerations or the factors that will influence Allbritton's contemplation of a holding company transaction or other plans he would propose for Riggs. Plaintiff points to the above as violative of two provisions of the 1934 Act. First, arguing that Allbritton has formulated a series of plans and projections based on a holding company as a vehicle for the repayment of the debt to be incurred by the tender offer purchases, plaintiff urges the Offer fails to disclose adequately the magnitude of these plans and their adverse consequences for Riggs. This failure to disclose plans to change the bank's business structure is asserted by plaintiff to be violative of the Williams Act. Additionally, the plaintiff contends the Offer may be viewed by shareholders as an alternative to the proposed Holding Company Transaction, or as an initial step in influencing their decision whether to submit proxies to approve the Transaction. Plaintiff submits the Offer thus constitutes a proxy solicitation and defendant's failure to comply with certain filing and disclosure requirements related to proxy solicitations, violates Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) and the Comptroller's Rules

thereunder. The plaintiff also alleges violations of Sections 14(d) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(d) and 78n(e), maintaining that defendants Allbritton, University, and Pierce have acted as a group to make the stock purchases, but that the Offer fails to identify University and Pierce along with Allbritton as the true bidders, and fails to disclose information about these corporate bidders. Thus, plaintiff argues that shareholders are deprived of material information necessary for them to make informed investment decisions. Other violations of the 1934 Act as claimed by the plaintiff include the violation of Section 13(d), 15 U.S.C. § 78m(d), by the defendants' failure to notify the Comptroller of the Currency at the time of the filing of the required forms and amendments in connection with the Carnicero Purchase, of their intention to acquire control of Riggs. Arguing that defendants had formulated the intent to make a tender offer and to acquire control of the bank well in advance of the date the Offer was announced, plaintiff submits defendants were obligated to amend their filings with the Comptroller in a timely fashion to reflect these intentions, as well as to disclose loan arrangements with third parties in connection with the tender offer. Further, plaintiff alleges that defendant Allbritton was obligated, under the Change in Bank Control Act of 1978, 12 U.S.C. § 1817(j) and as part of his Notice of Change in Bank Control filed December 8, 1980, to furnish the Comptroller with a description of his borrowing arrangements for the tender offer, an identification of persons to be retained to make solicitations to stockholders, and copies of all invitations or tenders or advertisements to be used in connection with the proposed acquisition. Thus, plaintiff attempts to raise a question as to whether the Office of the Comptroller has in fact approved[5] the tender offer, or if it has, whether it had sufficient information before it at the time of such approval.

**5.** As part of their obligations pursuant to the Change in Bank Control Act of 1978, 12 U.S.C. § 1817(j), defendants were required to file with the Comptroller a Notice of Change in Bank Control in connection with the Carnicero Purchase. Defendants contend that the Comptroller was aware of Allbritton's intent to acquire up to 700,000 additional shares of Riggs stock.

Finally, the plaintiff alleges that the Offer, if successful, will result in violations of Sections 3(a)(1), 3(a)(3), and 3(d)(1) of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. §§ 1842(a)(1), (a)(3), and (d)(1).[6]

Based upon the foregoing, the plaintiff urges that unless defendants are enjoined the shareholders of Riggs stock will be irreparably harmed by being forced to make an important investment decision in the absence of complete and material information regarding the qualifications and intentions of the offering party. Plaintiff submits that this harm will be greater than any injury that may result to defendants by the issuance of an injunction, since the tender offer can be made at a later time. Contending that the public interest will be served and that it has a likelihood of succeeding on the merits of its claim, the plaintiff contends it has demonstrated its entitlement to injunctive relief.

## CONTENTIONS OF THE DEFENDANTS

In answer [7] to the complaint and in opposition to the motion for preliminary injunction the defendants vigorously assert that financial information concerning the defendants need not be disclosed. To support this position the defendants first contend there is no *per se* requirement that an offeror include financial statements in its offering materials, and in particular, there is no specific requirement that financial statements of a bidder who, like Allbritton, is a natural person be disclosed. Arguing that the financial statements of a natural person may be required only under special circumstances making such information "materi-

al", defendants maintain the financial condition of Allbritton is not "material" within the meaning of the word as interpreted by case law on the subject. Defendants reason that shareholders who tender their Riggs stock for purchase and whose tenders are accepted, are concerned only with the payment to them of the price per share as offered. Defendants further suggest that, with respect to shareholders who decline the offer, only a poor financial condition of the bidder would be material to a decision, since such condition might be indicative of future corporate difficulties. Maintaining there is no question but that Allbritton is a person of substantial wealth and that his reputation as such is well-established, defendants declare there is no need for disclosure of particulars concerning his wealth.[8] In further response to plaintiff's claims under the Williams Act, defendants contend there is no need to disclose information concerning debt repayment and cash flow in that there is no genuine question about Allbritton's ability to repay the debt to be incurred for the purchases and further, that the inclusion of such data would only serve to confuse the shareholders. Also, with respect to other alleged nondisclosures as to Allbritton's future plans and the possibility of default, defendants assert that securities laws do not require speculation as to future events, and that such speculation could be misleading.

Relying on the decision of the Federal Reserve Board, which in pertinent part, stated that in the Board's view Allbritton is acting as an individual using his personal

---

**6.** On February 25, 1981, the plaintiff petitioned the Federal Reserve Board to issue a cease and desist order, and such petition was denied. The Court is informed that plaintiff has appealed that decision to the U. S. Court of Appeals for the District of Columbia Circuit. At the hearing on the preliminary injunction, counsel for the plaintiff stated he did not intend to argue these alleged violations at this time, but wished to reserve his right to do so at the trial on the merits. Defendants maintain that the Court has no jurisdiction over these claims and that primary jurisdiction under the Bank Holding Company Act rests with the Federal Reserve Board. Accordingly, the Court will not

consider this issue in the resolution of the matter before it.

**7.** The defendants have filed a counterclaim against the plaintiff. However, the issues presented therein are not before the Court at this time.

**8.** The defendants have submitted to the Court a proposed supplemental disclosure which provides some information with regard to Allbritton's financial condition. They urge the Court to accept this proposal for disclosure in the event the Court finds the Offer requires disclosure of financial information.

resources in his efforts to acquire the Riggs shares, defendants advance the argument that under the doctrine of collateral estoppel, this holding is binding upon the Court. So, they contend, nothing remains to be considered of plaintiff's allegation that defendants have failed to identify and to disclose information about the true bidders.

In opposition to plaintiff's claim that Allbritton failed to disclose to the Comptroller in pre-offering filings his intent to acquire control of Riggs by way of a tender offer, defendants first urge that any nondisclosure was subsequently cured by the filing of the tender offer on February 9, 1981, and the need for an injunction therefore is obviated. However, defendants further state the pre-offering filings were accurate since the evidence demonstrates that Allbritton did not actually decide to make a tender offer before February 8, 1981. Although admittedly some preliminary planning took place before that time, defendants urge it is the timing of the decision that is critical to this issue and the formation of Allbritton's intent to make the tender offer.

Defendants refute plaintiff's assertion that they have engaged improperly in a proxy solicitation, arguing that the Offer is not a solicitation within the meaning of the applicable statute and rules. In any event, they contend the appropriate remedy for a violation of these laws would be for the Court to order a resolicitation of the Offer and/or postponement of the shareholders meeting rather than enjoin the tender offer.

Lastly, defendants submit the plaintiff has brought this action solely for the purpose of thwarting the tender offer. Alleging that plaintiff has violated its fiduciary obligations to its shareholders by refusing to consider seriously the tender offer and to act in the best interest of the shareholders, defendants advance the doctrine of unclean hands as a basis for this Court to deny the plaintiff the equitable relief it seeks.

For the foregoing reasons defendants declare that the plaintiff has failed to demonstrate its entitlement to a preliminary injunction, and in particular, that it has not shown a likelihood of success on the merits, that the irreparable harm asserted is only to Riggs management and not to the shareholders, the real parties in interest, and that on balance, more harm will indeed result to the defendant Allbritton if the injunction is granted than will result to the plaintiff if denied.

## REQUIREMENTS FOR A PRELIMINARY INJUNCTION

The four factors to be considered by this Court in determining whether to grant preliminary injunctive relief are (1) the likelihood that plaintiff will prevail on the merits; (2) whether the plaintiff will suffer irreparable harm if injunctive relief is not granted; (3) a balance of the equities—whether more harm will result to the plaintiff from the denial of injunctive relief than will result to the defendants from the grant of such relief; and (4) if appropriate, the public interest. *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). The Court of Appeals of this Circuit, in interpreting the first factor enunciated in *Virginia Petroleum Jobbers*, has held that "a court, when confronted with a case in which the other three factors strongly favor interim relief, may exercise its discretion to grant a stay if the movant has made a substantial case on the merits." *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.* 182 U.S. App.D.C. 220, 222, 559 F.2d 841, 843 (1977) "The necessary 'level' or 'degree' of possibility of success will vary according to the Court's assessment of the other factors." *Id.* 559 F.2d at 843. The Court will analyze each factor separately.

### Securities Exchange Act of 1934 and Williams Act Claims

To the extent the issue of whether the Offer accurately identifies the tender offeror and discloses pertinent information with respect to such bidder or bidders impacts upon the other issues involved in this case, the Court will first address this question. Section 14(d) of the 1934 Act requires any person or group making a tender offer

which, if successful, would result in the offeror's ownership of more than five percent of the outstanding shares of a class of registered equity securities to file with the Securities and Exchange Commission (SEC) a statement[9] containing certain information, no later than at the time of the commencement of the offer. 15 U.S.C. § 78n(d). Item 9 of the Comptroller's Form F–13, entitled "Financial Statements of Certain Bidders" provides:

> Where the bidder is other than a natural person and the bidder's financial condition is material to a decision by a security holder of the subject bank whether to sell, tender or hold securities being sought in the tender offer, furnish current, adequate financial information concerning the bidder.

The Comptroller's rules define the term "bidder" as "any person who makes a tender offer or on whose behalf a tender offer is made" 12 C.F.R. § 11.5(1)(2)(i). The plaintiff construes these and other provisions of the 1934 Act and applicable rules to require that University and Pierce, as well as Allbritton, be described as bidders in the Offer. The plaintiff maintains that since University and Pierce were part of the group that participated in the Carnicero Purchase, and since it is clear the shares held by the group will be voted together to veto the Holding Company Transaction, the defendants' failure to identify fully the group as the bidders on the tender offer violates Sections 14(d) and 14(e) of the 1934 Act, since the Offer is obviously being made on behalf of Allbritton, University, and Pierce. While the Court, at this time, does not find, as urged by defendants, that the decision of the Federal Reserve Board is entitled to a collateral estoppel effect upon the identical issue in this case, the Court must give consideration to the evidence presented herein. The evidence clearly and convincingly establishes that the debt to be incurred for the purchase of the tendered shares is to be assumed solely and personally by Allbritton. There is further evidence that during Allbritton's discussions and negotiations regarding the tender offer, the focus was upon him as sole purchaser. Plaintiff submits that Allbritton is acting with Pierce and University as a "group" in this Offer and presents evidence to support its position. The Court finds, however, that there is no credible evidence—direct or circumstantial—from which it may find or infer that relative to the instant Offer Allbritton is acting in conjunction with his affiliates. The Court finds, therefore, that defendant Allbritton is the sole bidder in the Offer.

■ The second issue to be addressed is whether Allbritton, as the sole purchaser and bidder, has failed to adequately disclose material information, in violation of Section 14(e) of the 1934 Act. Both parties concur generally that the purpose of the Williams Act, which was adopted in 1968 in response to the proliferation of cash tender offers as a means for securing corporate control, "is to insure that the public shareholders who are confronted by a cash tender offer for their stock, will not be required to respond without adequate information . . . ." *Piper v. Chris-Craft Industries*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977), citing *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975). The legislation requires takeover bidders to file a statement with the SEC, and in circumstances involving a national bank, with the Comptroller of the Currency, indicating among other things, the background and identity of the offeror, the source and amount of funds or other consideration to be used in making the purchases, the extent of the offeror's holdings in the target corporation, and the offeror's plans with respect to the target corporation's business or corporate structure. 15 U.S.C. § 78m(d)(1). The antifraud provision of the Williams Act focuses on the inclusion in a tender offer of "any untrue statement of material fact" and the omission from an offer of "any material fact necessary in

---

**9.** The Comptroller of the Currency had designated Form F–13 as the appropriate filing required under this portion of the statute.

order to make the statements made . . . not misleading". 15 U.S.C. 78n(e). The operative word is "material" and Congress saw fit to leave the term to judicial interpretation. The general standard of materiality under the federal securities laws is defined by the Supreme Court:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), as applied to Section 14(e) in *Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 361 (2d Cir. 1979); *Flynn v. Bass Bros. Enterprises*, 456 F.Supp. 484 (E.D.Pa.1978).

▇▇▇ Turning to the particulars the plaintiff maintains are material and must be disclosed, the Court first finds that plaintiff has failed to show a likelihood of proving the Offer does not adequately describe defendant's plans and proposals for Riggs with respect to a bank holding company. The Court is persuaded by the evidence before it that Allbritton has seriously considered and has developed plans for the formation of a bank holding company which would incur a 75/25 debt to equity ratio, issue to each stockholder one unit of stock in the company plus three units of cash from the proceeds of the debt issue, and assume Allbritton's debt. The evidence further establishes that this holding company plan was submitted to the lending institutions contemplating the financing of the tender offer to demonstrate how Allbritton's loan would be repaid. However, the Offer contains sufficient information with respect to this plan, stating at Section 11:

> The Purchaser has considered, and will continue to consider, various alternative structures with regard to a holding company for the Bank, including a holding company in which all stockholders of the Bank would receive a combination of equity and debt securities or a combination of equity securities and cash generated through borrowings by the holding company, and he may propose a form of holding company transaction in the future. The organization of a bank holding company would be subject to the approval of the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 and, depending on the method of organization, the Comptroller, and the approval of the stockholders of the Bank. There is no assurance that such approvals could be obtained.
>
> The Purchaser has considered, and may in the future consider, various courses of action with respect to the Bank, including, among other things, (i) acquiring a larger interest in the Bank through a subsequent tender offer or otherwise, (ii) seeking representation on the Board of Directors of the Bank and (iii) the formation of a holding company for the Bank on terms different from those contemplated by the Holding Company Transaction. The Purchaser may in the future also decide to dispose of his holdings in the Bank. The Purchaser has not yet determined to proceed with any of the foregoing alternatives. Any decision by the Purchaser will take into account various factors, such as the Bank's business and prospects, other developments concerning the Bank (including, but not limited to, the attitude of the Board of Directors and the management of the Bank), other business opportunities available to the Purchaser, developments with respect to the Purchaser's business, general economic conditions and money and stock market condition.

The Offer properly provides information concerning the nature and type of holding company under consideration by Allbritton and the approval that will be required prior to its formation. Certainly, at the time such a transaction may be submitted for shareholder approval, complete details about the proposed structure will be disclosed. However, the Court is of the opinion that the inclusion of the details in the Offer at the present time could serve to confuse and to mislead the shareholders by providing them with too much information on a contingent and speculative plan.[10] Cases concerning similar securities transactions have held that "it would be a serious infringement of these [SEC] regulations to overstate the definiteness of the plans as to understate them." *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969), cited in *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1085 (5th Cir. 1970). "Though the offeror has an obligation fairly to disclose its plans in the event of a takeover, it is not required to make predictions of future behavior, however tentatively phrased, which may cause the offeree or the public investor to rely on them unjustifiably". *Id.* at 1085–86.

The loan agreement executed by defendant Allbritton for the purchase of the tendered shares shall next be analyzed with respect to materiality and disclosure. Section 4.2.2 of the Pledge Agreement of February 5, 1981, (Section 5.2.2 of the Loan Agreement) provides in part:

> The Borrower will not . . . (a) Permit or suffer any issuer of Collateral to dissolve, liquidate, retire any of its capital stock, reduce its capital stock or merge [or] consolidate with any other entity, or (b) vote any of the collateral in favor of any of the foregoing.

The Offer does not contain any reference to this provision and the plaintiff charges such omission as violative of the Williams Act.

The import of this provision is that if the proposed bank holding company transaction by Riggs or the possible bank holding company proposal considered by Allbritton were adopted, such transaction would constitute an event of default under the loan agreement. The Court finds and concludes that the default provision is material information which a shareholder is likely to consider significant in an investment decision. The Court rejects defendants' arguments that the events which would trigger a default are so remote that disclosure of this information would be more confusing than illuminating. While the defendants argue that the lending banks have agreed to waive any claim of default under this provision with respect to the Riggs' proposal, the record is devoid of any such actual waiver. Riggs shareholders are scheduled to vote on the Holding Company Transaction on April 22, 1981. This is not speculative but a matter of fact. Furthermore, while the Court has found that defendants need not disclose further details about a proposed holding company, the Court explicitly stated that there appear to be plans therefor. The shareholders are entitled to be informed of the consequences to the bank of any change in corporate structure. If the loan were to be defaulted, the lending institutions could take the Riggs stock held as collateral and commence selling on the open market thus depressing the market value so severely that holding shareholders may consider this information significant. The Court does not agree with defendants that the only consideration important to shareholders is the ability of the offeror to pay the purchase price. Indeed, the Williams Act on its face requires more. Certainly, those shareholders considering holding their shares will be concerned about the future of their investment in Riggs. Furthermore, those shareholders who made the decision to hold based on the information provided may choose to tender or sell in the open market.

10. The term speculative in this context is meant to indicate there is no evidence tending to show when a bank holding company of this nature would be proposed. The Court also queries whether the inclusion of detailed information regarding Allbritton's bank holding company plan would lend further support to plaintiff's argument that the Offer is a proxy solicitation. However, the Court makes no findings on these issues.

Based upon the above, the Court finds and concludes that the default provision in the loan agreement is material and must be disclosed by defendant.

The next issue presented pursuant to the Williams Act is whether defendant Allbritton is required to disclose financial information in the tender offer. The plaintiff submits the materiality standard as applied to this case dictates that defendant Allbritton disclose and provide to the shareholders financial and cash flow statements, preferably in accordance with generally accepted accounting principles ("GAAP"), including consolidated or combined statements, reflecting the relationships between Allbritton and his affiliated corporations.[11] In its memorandum of points and authorities in support of the preliminary injunction, plaintiff has detailed its view of how the requested financial information and statements are important to the shareholder's decision. Rejecting defendant's proffered disclosure as incomplete and based merely on opinions and appraisals, the plaintiff stresses that a shareholder must be provided with the total picture to be able to adequately assess Allbritton's ability to repay the loans he will incur for the purchase of tendered shares.

■ The Court does not disagree with defendant's contentions that there is no *per se* requirement that an offeror include financial statements in the offering material and that there is no specific requirement for financial statements of a bidder who is a natural person. In the opinion of the Court, the inclusion in the Offer of the detailed financial statements as requested by plaintiff would be confusing to a reasonable shareholder. It is not even apparent what a shareholder could hope to conclude from a review of such statements. The type of disclosure sought by plaintiff, which concerns defendant Allbritton's ability to repay the interest and principal of the debt he will incur, can be provided in a more direct and less confusing manner. While

the Court finds plaintiff has not shown a likelihood of proving that financial information of the type it seeks is material, the Court does find and conclude that plaintiff has demonstrated the disclosure of some financial information is material and thus required.

Prior to describing the type of disclosure the Court deems necessary, the Court finds that under the special circumstances presented in this case, certain financial information is material. See SEC's *1934 Act Release No. 13787*, [1977–78 Transfer Binder] Fed.Sec.L.Rep. ¶ 81,256 (CCH) (July 21, 1977), at 88,379 n. 22 ("under the facts and circumstances of a particular tender offer, financial information concerning a bidder who is a natural person may be material"). The Offer, if successful, will result in at least a 35% controlling interest by Allbritton in a national bank. While the purpose of the Williams Act is to protect shareholders, the Court cannot ignore that the target is a national bank and there will remain after a successful tender offer sixty-five per cent of the stock in other shareholders. The Court does not agree with defendants' comments that this is simply a struggle between rich people for control of a bank. Moreover, the offer is made by an individual who will incur a debt of fifty million dollars for these purchases alone.

The Court does find material Allbritton's plan for the repayment of the principal and interest of his current and anticipated indebtedness with respect to the purchase of Riggs stock. On this matter the Offer states at Section 12:

The Purchaser has not decided on a plan or proposal for the repayment or refinancing of the aforesaid borrowing. See Section 11 with respect to a possible proposal for the formulation of a holding company on a basis which, if made and consummated, might have the effect of providing the Purchaser with more funds than are presently available from dividends of the Bank to repay the aforesaid borrowings.

11. The Court will assume the plaintiff maintains this position, even in light of the Court's

finding on the "bidder" issue.

The Court will order that this section of the Offer, entitled "Source and Amount of Funds", be amended to include certain other information, including Allbritton's estimated net worth and the valuation of his major assets, the schedule of interest charges to be paid prior to the maturity of the principal, the anticipated source of payment of the interest charges, and the other alternatives considered for the repayment of the principal amount of the loan. In ordering the disclosure of this information the Court makes the specific finding that, "there is substantial likelihood that a reasonable shareholder would consider it important in deciding whether to accept the tender offer," *Seaboard World Airlines, supra*, 600 F.2d at 361, as it is of significance in evaluating the overall future of the bank.

The defendant's alleged violation of Section 13(d) of the 1934 Act by his failure to inform the Comptroller of the Currency and the investing public of his intent to seek control by means of a tender offer prior to the actual announcement of the Offer is another claim presented by plaintiff. The gravamen of this claim is that in pre-offer filings made in connection with the Carnicero Purchase the defendant did not disclose the intent to seek control of Riggs Bank, although, as plaintiff submits, the intent to seek control by way of tender offer was formulated at the time. Defendant steadfastly maintains the final decision to proceed with the Offer was not made until February 8, 1981, one day before the Offer was announced. Alternatively, defendant contends that any violation of Section 13(d) was cured subsequently by the Offer itself.

The Court rejects the defendant's position that the intent to make a tender offer, and thus to acquire control of the Bank, was formulated not earlier than the day before the Offer was announced. The Court may accept that the final decision was not made until February 8 but final decision and intent in this connection are surely distinguishable. The totality of the evidence before the Court substantiates the plaintiff's contention that defendant has long contemplated control of Riggs Bank.

While the Court need not find the precise date the intent was formed, the evidence strongly suggests that it was at least contemporaneous with the contemplation and negotiation of the Carnicero Purchase. The plaintiff has demonstrated its likelihood of succeeding on this claim.

### Change of Bank Control Act

Plaintiff maintains that defendant Allbritton has not complied with requirements of the Change in Bank Control Act of 1978 ("Control Act") with respect to the tender offer, and that assertions within the tender offer that no further approval of the Comptroller must be obtained are material misstatements in violation of Section 14(e).

The Offering Circular refers to the Control Act in two significant respects. In the introductory paragraphs, the Purchaser states:

Pursuant to the provisions of the Change in Bank Control Act of 1978, on December 8, 1980, the Purchaser filed a Notice of Change in Bank Control with the Comptroller of the Currency (the "Comptroller") with respect to the proposed Carnicero Purchase. In connection with such application, the Purchaser advised the Comptroller that he might acquire additional Shares and that for purposes of review of such Notice by the Comptroller the Purchaser did not anticipate that the number of additional shares would exceed 700,000. On January 13, 1981, the Purchaser received a letter from the Office of the Comptroller stating that the Comptroller did not intend to disapprove the proposed change in control and that the proposed acquisition could proceed immediately. See Section 15. *No further approval of the Comptroller is required to purchase the 600,000 Shares which are the subject of the Offer.* If the Purchaser were to purchase more than 700,000 Shares pursuant to the Offer, the Purchaser would consult with the Comptroller prior to any such purchase. With regard to the Purchaser's right to elect to purchase more than 600,000

Shares, see Section 1. (Emphasis Supplied.)

In paragraph 15, the Purchaser asserts:

*Change in Bank Control Act.* The Change in Bank Control Act of 1978 prohibits any person from acquiring control of any federal insured bank or bank holding company through the purchase of voting stock of such insured bank or bank holding company unless such person gives the appropriate Federal banking agency 60 days written notice of the proposed acquisition and such agency has not issued a notice disapproving the proposed acquisition. The "appropriate Federal banking agency" with respect to the Bank is the Comptroller. On December 8, 1980, the Purchaser filed the required Notice of Change in Bank Control with respect to the Shares purchased pursuant to the Purchase Agreement. See Section 10. In addition, as a part of such notice the Purchaser advised the Comptroller that he might acquire additional Shares and that, for purposes of review of such Notice by the Comptroller, the Purchaser did not anticipate that the number of additional Shares would exceed 700,000. On January 13, 1981, the Purchaser received a letter from the Office of the Comptroller stating:

"The Office of the Comptroller of the Currency has reviewed and evaluated your Notice of Change in Bank Control of a National Bank involving The Riggs National Bank of Washington, D. C., received by this Office on December 8, 1980. Based on the information contained therein, and any other information available to this Office, this letter is issued to convey our intent not to disapprove the proposed change in control. Your proposed Acquisition may proceed immediately."

As noted in the Offer to Purchase, a Notice of Change in Bank Control was filed with the Comptroller of the Currency on December 8, 1980, with respect to the acquisition of the Carnicero shares.

The Control Act requires, in relevant part, that

No person, acting directly or indirectly or through or in concert with one or more other persons, shall acquire control of any insured bank through a purchase, assignment, transfer, pledge, or other disposition of voting stock of such insured bank unless the appropriate Federal banking agency has been given sixty days' prior written notice of such proposed acquisition or extending for up to another thirty days the period during which such a disapproval may issue. 12 U.S.C. § 1817(j)(1).

The Control Act further requires certain information that the acquirer must furnish with respect to the proposed change of control:

(C) The terms and conditions of the proposed acquisition and the manner in which the acquisition is to be made.

(D) The identity, source and amount of the funds or other consideration used or to be used in making the acquisition, and if any part of these funds or other consideration has been or is to be borrowed or otherwise obtained for the purpose of making the acquisition, a description of the transaction, the names of the parties, and any arrangements, agreements, or undertaking with such persons.

(E) Any plans or proposals which any acquiring party making the acquisition may have to liquidate the bank, to sell its assets or merge it with any company or to make any major change in its business or corporate structure or management. 12 U.S.C. § 1817(j)(6)(C), (D), and (E).

Upon its review of all information furnished by the acquiring person as prescribed by the Act, the appropriate Federal banking agency may disapprove the proposed acquisition if it is determined that such acquisition would result in restraint of trade, or that "the financial condition of any acquiring person is such as might jeopardize the financial stability of the bank or prejudice the interest of the depositors of the bank." § 1817(j)(7)(C).

Where acquisition of control of a national bank such as Riggs is proposed, such acquisition will be subject to review by the

Comptroller of the Currency. The Comptroller's Statement of Policy with respect to the Control Act provides:

In assessing the financial condition of the acquiring person, the Comptroller will weigh any debt servicing requirement in light of the acquiring person's overall financial strength, the institution's earnings performance, asset condition, capital adequacy, future prospects, and the likelihood of an acquiring party making unreasonable demands on the resources of the institution.

The financial condition of an acquiring person will thus be carefully scrutinized, with particular attention focused on any debt servicing requirements in connection with the proposed acquisition. A determination by the Comptroller that the magnitude of debt servicing requirements will result in jeopardy to the "safety and soundness" of the target institution will be grounds for disapproval.

Notice requirements under the Control Act will be triggered whenever a proposed acquisition will result in "control" of a Federally insured bank. For purposes of the Control Act, "control" is defined as "the power, directly or indirectly to direct the management or policies of an insured bank or to vote 25 per centum or more of any class of voting securities of an insured bank." 12 U.S.C. § 1817(j)(8)(B).

Regulations issued by the Comptroller pursuant to the Control Act provide that for purposes of such regulations, the term "control" shall have the same meaning and content ascribed to it under the Act. 12 C.F.R. § 15.2 (1980). The Control Act requires that advance notice be given only where a proposed acquisition will result in a 25% voting power, or actual control at a lesser proportion. The Comptroller has established, however, that a rebuttable presumption of "control" will be created for notice purposes by the proposed acquisition of 10% of a bank's voting securities, where no greater proportion of voting power will be held by any other person immediately after the proposed transaction is completed.

■ Filing requirements under the regulations implementing the Control Act were clearly triggered by the proposed acquisition of the Carnicero shares. The proposed acquisition of an aggregate of 386,645 shares by defendant Allbritton and his affiliates, Pierce and University, would result in their control of approximately 15% of the outstanding voting securities of Riggs, a figure in excess of the 10% threshold level for presumption of control under 12 C.F.R. § 15.3. Defendant Allbritton and his affiliates filed a Notice of Change in Bank Control with the Comptroller on December 8, 1980. With the filing of that Notice, the Allbritton group sought clearance from the Comptroller for their purchase of the Carnicero shares as a group. As named Purchasers in the Option Agreement executed with Carnicero, the Allbritton group submitted for the Comptroller's review all requisite financial information, including details of the debt servicing requirement to be borne by the group. Defendant Allbritton and his affiliates advised the Comptroller further on December 19, 1980, that defendant Allbritton in his individual capacity might seek at some unspecified time the acquisition of Riggs shares in addition to those to be purchased from Carnicero by the group.

In the December 19, 1980, letter to the Comptroller, defendant Allbritton and his affiliates advised the Comptroller that supplemental information regarding possible additional purchases was being supplied "in connection with the pending review of the Notice" filed December 8, 1980. For purposes of such review, the letter noted that

While no decision has been made with respect to the acquisition of additional shares or the timing of any such acquisition, you are advised for the purposes of your review that it is anticipated that any additional purchases would not exceed 700,000 shares. Mr. Allbritton contemplates that the funds for any such purchase would be provided by a loan from one or more commercial banks, a sale of assets by Mr. Allbritton or a combination of the foregoing.

It appears clear from the language of the December 19, 1980, letter that a firm decision to purchase additional shares had not yet been made. It appears equally clear that the supplemental information supplied was for use by the Comptroller with respect only to his determination on the proposed Carnicero acquisition. Defendant Allbritton maintains that as a result of the December 19, 1980, letter, the Comptroller was fully aware of his anticipated purchase of up to 700,000 additional Riggs shares. He argues that because the Comptroller had considered his anticipated additional purchases in connection with the Carnicero acquisition, the Comptroller's authorization of the Carnicero acquisition on January 13, 1981, must be viewed as encompassing an intent not to disapprove Allbritton's individual acquisition of the additional shares.

As noted in the Offering Circular, the January 13, 1981, letter advises the Allbritton group that "[y]our proposed *Acquisition* may proceed immediately." (Emphasis Supplied.) In light of the understanding given to the Comptroller that plans for acquisition of additional shares were still highly tentative, it seems obvious that the Carnicero purchase was the only acquisition ready to "proceed immediately". That the Comptroller's January 13, 1981, letter pertained exclusively to the Carnicero purchase is emphasized further by the language of that letter's penultimate paragraph, which states:

It is requested that the date of consummation of this change in control be provided to this Office within 30 days after the date of consummation. If the *transaction* has not been consummated within one year from the date of this letter, or if the terms or conditions or any of the parties to the transaction change, please inform us in writing. If necessary, this Office reserves the right to require submission of an amended Notice. (Emphasis Supplied.)

Indeed, the Allbritton group subsequently notified the Comptroller on February 2, 1981, that Allbritton would be substituted as the purchaser of 85,230 shares originally designated for purchase by Pierce.[12]

Despite defendant Allbritton's inability to argue away what can be discerned as the Comptroller's intent to authorize only the Carnicero purchase, Allbritton argues that the Office of the Comptroller itself has twice assured him that no additional filings or clearances are needed with respect to any additional purchases of Riggs stock. A thorough review of all evidence submitted by both parties reveals, however, no written confirmation from the Comptroller's Office that such assurances were given. To the contrary, the Comptroller's Office in a letter dated March 6, 1981, clearly contradicts evidence submitted on behalf of defendant Allbritton to support his claim that no further clearance need be sought. The March 6, 1981, letter merely states that

While the Act and implementing regulations require only one *filing* of a notice [of Change in Bank Control], they demand that this one notice provide full and accurate disclosure regarding the transaction. In this connection, it is asserted on behalf of Riggs that disclosure by Mr. Allbritton was incomplete and/or inaccurate. On behalf of Mr. Allbritton, these allegations have been denied. The information available to the OCC at this time is insufficient to permit an informed resolution of the issues thus raised. (Emphasis Supplied.)

The Comptroller thus makes it clear that only one "filing" is required under the Act and its regulations, regardless of whether or not additional shares are sought. What the letter does not make clear, is whether or not defendant Allbritton was required to submit additional, supplemental information—and await authorization by the Comptroller—prior to proceeding with his tender offer.

This Court need not decide, as a matter of law, whether defendant Allbritton was required under the Control Act and its regulations to seek clearance from the Comptroller prior to his purchase of the 600,000

12. Form F-11, Amendment No. 2, filed February 2, 1981, by the Allbritton group.

shares sought in the Offer to Purchase. Serious questions have been raised, however, as to the sufficiency of defendant Allbritton's disclosures in the Notice of Change in Bank Control filed December 8, 1980, and as supplemented on December 19, 1980, with respect to any additional acquisition. As discussed previously, the Comptroller's letter of January 13, 1981, clearly conveys his intent to not disapprove only the acquisition of the Carnicero shares. The acquisition of an additional 600,000 shares by Allbritton, in his individual capacity as Offeror under an Offer to Purchase, presents a markedly different set of considerations from those which led the Comptroller to authorize the Carnicero purchase. As defendants have vigorously argued, and as the Court finds, defendant Allbritton makes the Offer in his name alone and relies on his own financial resources exclusively in paying for tendered shares. The source and amount of funds to be used in carrying out the Offer, as well as the details of debt servicing requirements which must be met, are obviously not identical to those disclosed by the Allbritton group and considered by the Comptroller prior to his clearance of the Carnicero purchase. Perhaps the most significant aspect of defendant Allbritton's Offer with respect to Control Act requirements is that it represents an attempt to gain an additional 20% of Riggs voting shares. There is no dispute that through the Carnicero purchase, defendant Allbritton gained voting power over approximately 15% of the bank's outstanding voting securities. Under the Offer, however, defendant Allbritton, if successful, would gain control of an aggregate of 35%, an amount beyond the 25% mark defined as "control" in the Control Act. Notwithstanding the presumption of control which arises under the regulations where a 10% ownership is to be acquired, the Control Act itself establishes a 25% threshold, or any lesser percentage which represents *actual* control. 12 U.S.C. § 1817(j)(8)(B). Indeed, the regulation of any change in the *actual* control of a federally insured bank is what is contemplated under, and provided for, by the Act. Although the Act requires the Comptroller to review all Notices for any indications that change in control might result in a monopoly, or otherwise be in restraint of trade, the Comptroller's chief duty under the Control Act is to ensure the safety and soundness of the target institution and the banking industry as a whole. Regulations issued by the Comptroller to require compliance with Notice requirements where a 10% acquisition is proposed would appear to ensure that the purposes of the Act will be carried out.

Acquisitions beyond the 10% mark would not appear to negate the Comptroller's duty to review additional acquisitions within the statutorily established 25% level, where 10% did not represent *actual* control. Defendants have not maintained that their acquisition of the Carnicero Shares resulted in actual control of Riggs by the group. In item 11 of his Offer to Purchase, defendant Allbritton does state, however, that

> If 600,000 additional Shares are thus purchased, the Purchaser and his affiliates will own approximately 35% of the Shares outstanding, *and this number of Shares may constitute effective control of the Bank by the Purchaser.* (Emphasis Supplied.)

Acquisition of the shares sought under the tender offer would thus represent attainment of actual control of Riggs by defendant Allbritton for the first time.

Additional purchases of shares by either the Allbritton group or by defendant Allbritton, individually, would not appear, therefore, to be exempt from prior notice requirements as provided under 12 C.F.R. § 15.5. Section 15.5(a) provides that prior notice requirements are inapplicable to

> the acquisition of additional shares of a national bank by a person who continuously since March 9, 1979, held power to vote 25 per cent or more of the voting shares of that institution, *or by a person who has acquired and maintained control of that institution after complying with the Act's procedures. . . .* (Emphasis Supplied.)

Since defendant Allbritton has yet to gain actual control, or 25% of Riggs voting stock,

the provisions of § 15.5(a) seem clearly inapplicable to his acquisition of additional shares through a tender offer.

Considering the extent of disclosure required under the Control Act, and the degree of scrutiny the Comptroller must exercise prior to authorizing acquisition of shares which might not even represent actual control, it seems highly unlikely that the Comptroller's January 13, 1980, authorization encompassed all the clearance necessary for defendant Allbritton's acquisition of an additional 20% of Riggs shares. A contrary view of requirements under the Control Act and its regulations would raise the possibility of an acquiring person gaining clearance at a 10% ownership level, and being free to make subsequent acquisitions regardless of any risk those purchases might pose to the target bank and its depositors. Such possibilities are clearly not contemplated under the Control Act and would seem to run counter to the regulatory requirements established by the Comptroller.

In light of the serious questions raised as to whether or not defendant Allbritton was required to seek clearance from the Comptroller prior to his acquisition of 600,000 additional shares, plaintiff's Williams Act claim with respect to statements in the Offer present a pivotal issue in this action. The Williams Act was designed to protect shareholders in connection with transfers of corporate control, and thus mandates the disclosure of information in order to enable a shareholder to protect his or her investment.

Where a bidder, such as defendant Allbritton, seeks to acquire control of a national bank through the device of a tender offer, disclosures—or omissions—in the tender offer concerning any actions taken by the Comptroller will be material. Plaintiff and defendant presented expert witnesses on the issue of the adequacy of the offering circular as it reflects the financial condition of the bidder. Plaintiff's expert termed the materials "woefully inadequate." Defendant's expert, Alan C. Greenberg, testified that the materials were adequate for shareholders to make a decision on whether or not to tender.

Of significance, however, is the testimony of Mr. Greenberg that an "reasonable investor" who read the Offering Circular would conclude that the Comptroller thinks Allbritton is a "man with real net worth." This conclusion was reached by Mr. Greenberg based upon his interpretation of the materials presented to shareholders. Clearly, Mr. Greenberg, drawing upon his expertise and experience, is in a far superior position to interpret Offering Circulars than the reasonable shareholder who must rely upon the same materials to make an informed decision.

Mr. Greenberg understood the Offering Circular with respect to the role of the Comptroller as follows:

In the material it states that the Comptroller of the Currency raised no objection when Mr. Allbritton wished to purchased the first 450,000 shares. It also states in the material that it has no objection to Mr. Allbritton trying to purchase an additional 700,000 shares. (TR. 42)

Well, the information given, and the approval of the Comptroller of the Currency, plus the fact that Mr. Allbritton was invited on the board, certainly would lead any reasonable shareholder to believe that this is a man of substance; and I don't think they'd be concerned about how he could finance it. (TR. 47)

The testimony of Mr. Greenberg underscores the Court's concern that defendant Allbritton's statement in the Offering Circular that "no further approval of the Comptroller is required to purchase the 600,000 shares which are the subject of this offer" is not only a misstatement but also misleading in violation of Section 14(e) of the Williams Act. Plaintiffs have met their burden of showing that it remains a matter of speculation whether or not the Comptroller has "no objection" to defendant Allbritton's acquisition of a controlling interest in Riggs. As defendants' own expert witness has testified, statements contained in both item 11 and item 15 of the Offering Circular create the impression—even in the mind of a highly experienced investor—that all

regulatory requirements have been complied with, and that no further clearance need be sought prior to the purchase of tendered shares.

### Other Claims

The complaint claims violations by defendants of Section 14(a) of the 1934 Act and the Comptroller's Rules thereunder, by their allegedly engaging in a proxy solicitation, without completely and adequately disclosing information concerning the Holding Company Transaction and without complying with certain filing requirements. However, these claims were not pressed by the plaintiff at the preliminary injunction hearing and the Court declines to make any findings at this time with respect to this issue. The Court again states its intent not to consider the plaintiff's claims under the Bank Holding Company Act, 12 U.S.C. §§ 1842(a)(1), (a)(3), and (d)(1).

The defendants charge that Riggs is barred from obtaining equitable relief by the doctrine of unclean hands contending that the plaintiff has resorted to the Court only to prevent the lawful acquisition of an interest in a publicly-held company and has breached its fiduciary obligations to its shareholders. These claims are not supported by record evidence and the Court considers them to be without merit. Thus, the Court finds that the plaintiff is not barred from seeking equitable relief by the doctrine of unclean hands.

### Equitable Relief

Necessary to a decision to grant preliminary injunctive relief is the finding that the plaintiff will be irreparably injured in the absence of such relief. The Court is mindful of the fact that the provisions of the Williams Act were not designed to assist incumbent management in its resistance to takeovers, but the Court here is concerned with the harm which will result to the shareholders if the injunction is denied. The shareholders will be irreparably injured without injunctive relief by being compelled to make an important investment decision based upon an Offer to Purchase which is incomplete and materially misleading.

While defendants suggest there is an adequate remedy at law since shareholders aggrieved by violations of the securities laws can sue for damages, the Court considers this situation to be one in which the injury that will result cannot be alleviated by the payment of damages. The Offer is for less than all of the outstanding shares of the bank and, if successful, will vest effective control of the bank in an individual. Nontendering shareholders, as well as those who choose to tender are entitled therefore to be informed of the financial qualifications of the offeror and of the possible consequences of this shift in control on the bank. Once control is obtained by Allbritton, money damages cannot compensate injured parties who are concerned with their investment in the bank.

The Court also finds irreparable injury to shareholders who, in considering whether to hold, sell, or tender their shares, have or will rely upon the statement made in the Offer to Purchase that no further approval of the Comptroller of the Currency is required under the Change in Bank Control Act of 1978. Defendants' own expert witness testified that such statement would be material to a shareholder faced with this investment decision as it indicates the Comptroller has reviewed this transaction and considers it sound. Based upon the foregoing the Court finds and concludes the plaintiff has demonstrated it and its shareholders will be irreparably injured without injunctive relief.

The Court does not ignore the harm the defendant will suffer by the injunction and the Court acknowledges that delay in a tender offer can create serious harm to the offeror. It is possible that the offer can and will proceed at some point in the future, and the Court cannot find at this time the harm caused to defendants by the injunction is irreparable. Thus, and on balance, the equities favor injunctive relief. Moreover, the interest of the public in the effective administration of the securities and banking laws will be served by the injunction.

If the injunction which the Court shall issue were based solely on defendant's material omissions pursuant to Section 14(e) by the failure to disclose certain financial information, plans for debt repayment, and the terms of the default provision contained in the loan agreement, the Court would fashion a remedy allowing the tender offer to proceed after defendant made curative disclosures and the shareholders had sufficient time to consider the new information. Thus, in the absence of the findings made relative to the Change in Control of Bank Act of 1978, the Offer could proceed at some specified time and without awaiting a trial on the merits. However, because of the critical issues raised and questions presented by the Change in Bank Control Act the tender offer must be enjoined pending a trial on the merits. This is not simply a question of whether the Offer contains an untrue or misleading statement relative to the approval of the Comptroller of the Currency of this tender offer. If it were, a curative remedy could be fashioned. The Court is most concerned with the more significant issue of whether the defendant has actually complied with the Change in Bank Control Act as asserted in the Offering Circular, and has been authorized to proceed with the acquisition. Curative statements by defendant Allbritton cannot remedy this violation of the Williams Act under the circumstances of this Offer. Thus, in the absence of competent evidence which establishes that either defendant has complied or is not required to comply with the Change in Bank Control Act, and because of the impact of this matter upon all shareholders and the depositors of the bank, the tender offer must be enjoined pending a decision on the merits.

CONCLUSION

For the reasons set forth in this Memorandum Opinion, which constitutes the Court's Findings of Fact and Conclusions of Law, the Court finds and concludes that the plaintiff's motion for preliminary injunction should be granted.