PABST BREWING COMPANY, a Delaware corporation, Plaintiff,

v.

Paul KALMANOVITZ, Irwin L. Jacobs, Dennis M. Mathisen, Daniel T. Lindsay, Gerald A. Schwalbach, JMSL Acquiring Corp., a Delaware corporation, and PST Acquiring Corp., a Delaware holding company, Defendants.

Irwin L. JACOBS, Dennis M. Mathisen, Daniel T. Lindsay and Gerald A. Schwalbach, individually and derivatively as shareholders of Pabst Brewing Company, Counterclaimants,

v.

PABST BREWING COMPANY, William F. Smith, Jr., Thomas N. McGowen, Jr., August U. Pabst, Thomas J. Donnelly, Karl Eller, Ira C. Herbert, William E. Kimberly, Sheldon B. Lubar, Karl F. Hoenecke, Raymond Troubh and Frederick P. Stratton, Jr., individually and as members of the Board of Directors of Pabst Brewing Company, Counterclaim Defendants.

Civ. A. No. 82–711.

United States District Court, D. Delaware.

Nov. 17, 1982.

A. Gilchrist Sparks III and Kenneth J. Nachbar of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Michael W. Schwartz, Eric M. Roth and Barry A. Weprin of Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for plaintiff and counterclaim defendants.

R. Franklin Balotti and Jesse Finkelstein of Richards, Layton & Finger, Wilmington, Del., Dennis J. Block, James W. Quinn and Irwin H. Warren of Weil Gotshal & Manges, New York City, of counsel, for all defendants, except Paul Kalmanovitz, and counterclaimants.

Joseph Alioto of Alioto & Alioto, San Francisco, Cal., for defendant Paul Kalmanovitz.

## OPINION

LATCHUM, Chief Judge.

Plaintiff, Pabst Brewing Company ("Pabst"), has brought this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337, seeking injunctive relief against defendants Paul Kalmanovitz, Irwin L. Jacobs, Dennis M. Mathisen, Daniel T. Lindsay, Gerald A. Schwalbach, JMSL Acquiring Corp. ("JMSL"), and PST Acquiring Corp. ("PST") (collectively referred to as the "Jacobs Group"), from continuing JMSL's partial tender offer for 3 million shares (approximately 37%) of Pabst common stock (the "tender offer"). Pabst also seeks an order of the Court, pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the F.R.Civ.P., (1) declaring that a commitment by Chemical Bank to lend $49.5 million to JMSL, as well as any agreement executed pursuant to that commitment, will violate Section 7(f) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78g(f) (1976), and Regulation X, 12 C.F.R. § 224 (1982) promulgated thereunder. In addition, Pabst requests this Court to grant such further relief against the Jacobs Group in order to give full effect to the declaratory judgment, including an injunction against accepting any money under the loan commitment or purchasing any shares to be financed by the proceeds of that loan. (Docket Item ["D.I."] 1.)

Pabst, in its complaint, has alleged five causes of action. The first is a disclosure claim under Sections 14(d) and 14(e) of the Exchange Act. The second cause of action alleges that the proposed financing for the tender offer violates the margin requirements set forth in Section 7 of the Exchange Act and Regulation X. The third and fourth causes of action allege that the tipping of certain information about the Jacobs Group's plans, including the tipping of the tender offer to a Minnesota brokerage firm, violated Sections 14(e) and 10(b) and Rule 10b–5. The final cause of action alleges a prospective breach of the Jacobs Group's fiduciary duty as future controlling shareholders of Pabst. Pabst, at this time, seeks a preliminary injunction only on the first and second causes of action—the disclosure claims and the margin violations.[1]

## BACKGROUND FACTS

On October 26, 1982, JMSL announced its intention to make a partial tender offer for 3,000,000 shares of Pabst stock (approximately 37% of the outstanding shares) at a price of $24 per share. The tender offer commenced on October 27, 1982, pursuant to an Offer to Purchase bearing that date ("Offer to Purchase"). The Offer to Purchase generally provides that, if the tender offer succeeds, the individual members of the Jacobs Group will transfer the 1,140,305 shares of Pabst which they already own to JMSL, thereby giving JMSL control of approximately 50.6% of the outstanding shares of Pabst. The Offer to Purchase also states that the Jacobs Group intends to propose a second-step merger in which all Pabst shareholders other than JMSL will receive cash and/or debentures designed to have a value of at least $20 per Pabst share on a fully distributed basis.

1. Specifically, Pabst seeks to preliminarily and permanently enjoin the Jacobs Group from (1) acquiring or attempting to acquire any shares of Pabst stock by means of the tender offer, (2) making or attempting to make any tender offer or request or invitation for tenders of any shares of Pabst stock, (3) soliciting or arranging for the solicitation of orders to sell any shares of Pabst stock, (4) voting in person or by proxy any shares of Pabst stock, (5) attempting to affect or control or influence the management of Pabst, (6) consummating or expending funds obtained through the consummation of the loan agreement between JMSL and Chemical Bank, and (7) taking any other steps in furtherance of their unlawful scheme to acquire control of Pabst.

The Jacobs Group has counterclaimed, for injunctive and declaratory relief, pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1332, 1337 and 2201 and on principles of ancillary and pendent jurisdiction, as follows: (1) that Pabst and its directors be enjoined from engaging in any corporate transaction designed to disenfranchise Pabst shareholders solely to allow the incumbent board to maintain control over Pabst, (2) that McGowen, Chairman of the Board of Directors of Pabst and Smith, President and a member of the Board of Directors of Pabst, be enjoined from committing further breaches of their fiduciary duties to Pabst and its shareholders, and (3) that certain employment contracts entered into by Pabst with incumbent management be rescinded.

Pabst contends that the Offer to Purchase violates Sections 14(d) and (e) of the Exchange Act because the offer contains "a host of false and misleading" statements including: (a) the failure to disclose defendants' plans and proposals for the future management of Pabst; (b) the failure to disclose material information about Kalmanovitz's past business practices; (c) the failure to disclose material information about the finances of defendants Kalmanovitz and Jacobs, including their net worth, the value of their assets and the financial statements of their private companies; (d) the failure to disclose material information concerning the integrity of the defendants; and (e) the failure to disclose that the financing for the tender offer violates the margin rules. The Court will first discuss the contentions that the Jacobs Group has violated Sections 14(d) and (e) by its disclosures relating to the terms of financing and to the margin requirements.

FINANCING AGREEMENT WITH CHEMICAL BANK

Pabst contends that the tender offer is materially misleading because it fails to disclose that the financing for the tender offer violates Section 7 of the Exchange Act and Regulation X promulgated thereunder by the Federal Reserve Board. Thus, the Court must first determine whether the financing agreement between JMSL and Chemical Bank violates those regulations. See *Alaska Interstate Co. v. McMillian*, 402 F.Supp. 532, 553 (D.Del.1975).

A. *The terms for financing the tender offer.*

According to the Offer to Purchase, the total amount of funds required by JMSL to purchase the 3,000,000 shares pursuant to the tender offer and to pay the related cost is estimated to be approximately $73,000,-000. It states that JMSL intends to borrow up to $49,500,000 from Chemical Bank and has received a commitment letter from that bank for that loan. The balance of the funds required by JMSL to purchase the Pabst shares and to pay the related costs in acquiring them, estimated at $25,000,000, are to be received from the PST Acquiring Corporation.[2]

The proposed terms of the Chemical Bank loan to JMSL provide for advances from the Chemical Bank to pay for those Pabst shares purchased pursuant to the offer. The Chemical Bank loan is to be secured by all of the shares of Pabst owned by JMSL which will include the 3,000,000 shares it intends to purchase pursuant to the tender offer and 1,140,305 shares transferred to JMSL by PST and the Acquiring Shareholders.

The Offer to Purchase states that the commitment letter contains a number of significant conditions precedent to borrowing, which may be waived by the Chemical Bank including, without limitation, the following: (1) JMSL must have accepted such number of shares for payment pursuant to the offer that, upon the acquisition thereof, JMSL and the Acquiring Shareholders shall own at least a majority of the outstanding shares; (2) as of the date of the borrowing, JMSL shall have been capitalized with not less than 1,140,305 shares and $23,000,000 in cash; and (3) as of the date of borrowing, there must be no litigation pending or threatened by any governmental instrumentality or any other person challenging this offer, a merger of JMSL with Pabst, or any other aspect of the transactions contemplated hereby. Finally, the Offer to Purchase also states that borrowings under the Chemical Bank loan will be subject to, and will be made in accordance with, Regulation U of the Board of Governors of the Federal Reserve System.

B. *Regulations X and U.*

Regulation X, 12 C.F.R. § 224.2(a) (1982), promulgated by the Federal Reserve Board under Section 7 of the Exchange Act[3] provides in pertinent part:

---

2. JMSL is a Delaware corporation and a wholly-owned subsidiary of PST. The outstanding shares of PST are owned by Kalmanovitz (50%); Jacobs (24.5%); Mathisen (8.5%);

Lindsay (8.5%); and Schwalbach (8.5%) ("Acquiring Shareholders").

3. Section 7(f) provides, in pertinent part:

A borrower shall not obtain any purpose credit from within the United States unless he does so in compliance with the following conditions:

\*      \*      \*      \*      \*      \*

(3) credit obtained from a bank shall be subject to the provisions of Part 221 (Regulation U), except for section 221.-2(i).

Therefore, in order to determine whether a borrower is in compliance with Regulation X, the Court must look to Regulation U, 12 C.F.R. § 221.1(a)(1) (1982), which provides in pertinent part:

[N]o bank shall extend any credit secured directly or indirectly by any margin stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time in § 221.4 (the Supplement to Regulation U) . . . .

The maximum loan value of the collateral is defined in 12 C.F.R. § 224.4(a) (1982) which generally provides that the maximum loan value of any stock shall be 50 percent of its current market value, as determined by any reasonable method.

▮ Three elements must be demonstrated in order to establish a violation of Regulation U: (1) the credit was extended to a purchaser for the purpose of purchasing or carrying margin stock; (2) the loan was secured directly or indirectly by some stock (not necessarily by margin stock); and (3) the amount of the loan exceeded the maximum loan value of the collateral. *See Stonehill v. Security National Bank,* 68 F.R.D. 24, 35 (S.D.N.Y.1975). No dispute exists that the first element has been established. This is so because the Board of Governors of the Federal Reserve System has published a list, pursuant to 12 C.F.R. §§ 207.2(f), 220.2(e) and 221.3(d), which

states that Pabst common stock is margin stock. *See List of OTC Margin Stocks as of July 26, 1982,* 2 Fed.Sec.L.Rep. (CCH) ¶ 22,210 at 16,105–5 & 16,121. Nor is there any dispute that the loan for the purchase of Pabst stock by JMSL is going to be secured directly by some stock—the 4,140,-305 shares of Pabst stock which will be owned by JMSL. Thus, the only question in dispute is whether the amount of the loan exceeds the maximum loan value of the collateral. The resolution of this question requires a determination of the current market value of Pabst shares.

Pabst argues that there is no reasonable basis for JMSL or Chemical Bank to set the "current market value" of Pabst stock at $24 for margin loan purposes. It points out that Chemical Bank extended its $49,500,-000 loan commitment to JMSL in a letter dated October 26, 1982, the last full day prior to the commencement of the tender offer. Pabst maintains that this date was the last day the "current market value" was not artificially inflated by the JMSL tender offer. Accordingly, Pabst submits that Chemical Bank was required to value the 4,140,305 shares of Pabst common stock as of October 26.

On that date, the National Association of Securities Dealers' ("NASD") last bid and asked price quotations for Pabst common stock were 20⅛ and 20¼. Pabst argues that these prices, which allegedly represent what the market-makers were offering for Pabst common stock, is the *only* "reasonable method" for determining the maximum loan value of Pabst shares for purposes of credit. By multiplying the number of Pabst shares which will be used as security (4,140,305) with the bid price ($20⅛), the market value at that date according to Pabst, would be $83,322,728.25. Therefore, Pabst maintains that the maximum loan value is 50% of this number which equals $41,661,819. Thus, this maximum loan val-

It is unlawful for any United States person . . . to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender . . . for the purpose of (A) purchasing or carrying United States securities, or (B) purchasing or carrying within the

United States of any other securities, if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited . . . .

15 U.S.C. § 78g(f)(1).

ue if accepted would not sufficiently secure the $49,500,000 loan committed to JMSL.

Pabst further contends that before this Court can find that JMSL and Chemical Bank has complied with Regulation X and U, there would have to be a reasonable basis for valuing the Pabst common stock at $24. It argues that, because this value assigned to Pabst common stock would represent greater than an 18 percent premium over the market price *at the time the commitment letter was executed,* such calculation cannot be found to be reasonable.

JMSL disagrees with Pabst with respect to the method of valuation of the Pabst stock. JMSL maintains that the Pabst argument ignores the fact that the 4,140,305 shares that will be pledged as collateral for the Chemical Bank Loan will represent 50.6% of Pabst outstanding common stock and the control of the corporation. It argues that control stock is "always worth a substantial premium" above the current market price. JMSL also asserts that there is no better indication of the value of the Pabst stock than the actual price a *buyer* is willing to pay in an arm's length negotiation.

Thus, this Court must determine whether JMSL's tender offering price is a reasonable method by which one may ascertain the current market value of Pabst common stock. The Staff of the Board of Governors of the Federal Reserve System ("Federal Reserve Staff") has issued two opinions dealing with the question of whether an offering price, reflecting the premium for control of a corporation, may be used as the current market value for all of the shares owned by the borrower for margin purposes. Both opinions answered this question affirmatively. The first opinion, issued February 16, 1977, presented a factual situation where the borrower, who owned 85.8 percent of the outstanding stock of a publicly held corporation, was preliminarily planning to consummate a cash-out merger. The borrower sought the opinion of the Federal Reserve Staff regarding the valuation of the stock which was planned to be used as collateral. The Staff found, for the purposes of Regulation U, that the current market value of the corporate shares the borrower already owned could be the price the borrower has agreed to pay for the shares from the shareholders in the cash-out merger:

> Staff agrees that for purposes of Regulation U, the collateral value of the publicly held shares could be the price the borrower has agreed to pay for the shares. The current market value of the corporate shares the borrower already owns is to be determined by "any reasonable method" at the time the credit is actually extended. . . . If the bank loan is in fact made on the same date that the merger becomes effective, staff would not view the use of the amount paid to the public shareholders of the corporation as an unreasonable method for determining the current market value of the corporation stock already held by the borrower.

STAFF OP. of Feb. 16, 1977.

Authority: 12 CFR 221.4(a).

Federal Reserve Board Regulatory Service 5–959 (Staff Opinion, Feb. 16, 1977).

Likewise, in the second opinion issued by the Federal Reserve Staff, the borrower was planning initially to make large volume open market purchases, and then to make a tender offer for the margin securities. The Staff concluded that the borrower, for margin purposes, could value all of the margin securities at the tender offer price, so long as the value was the result of bona fide appreciation in the market value of the pledged stock:

> The price of a margin security is expected to increase during the course of a large volume of open market purchases made by a purchaser. The purchaser is considering a tender offer for the margin securities at a price exceeding the current open market price.
>
> For purposes of the above transaction, the purchaser intends to ask the lender to value all the margin securities pledged as collateral at the current open market trading price, allowing an increase in loan value as the price of the stock goes up.

If there is a tender offer by the purchaser, then at any closings under the terms of the tender offer, the purchaser intends to request that the lender value all of the margin securities at the tender offer purchase price, whether they are purchased in the tender offer or before the tender offer.

Staff concluded that nothing in the margin regulations would prevent the purchaser's benefitting from a higher loan value that is the result of a bona fide appreciation in market value of pledged collateral, as long as the determination is made at the time of any financing. STAFF OP. of Dec. 3, 1979. Authority: 12 CFR 221.4(a). Federal Reserve Board Regulatory Service 5–962 (Staff Opinion, Dec. 3, 1979).

Thus, although the Court cannot rely upon these opinions as conclusive, the Court finds that the facts in this case are sufficiently similar to the facts contained in the two opinion letters, so that the Staff's findings may be accorded substantial weight. In order to determine whether Staff Opinions, in general, should be accorded substantial weight, the Court will look to the provisions of Section 7, the legislative history of that statute, and the role the Federal Reserve Board plays in the regulation of credit.

Section 7(a) expressly states that "the Board of Governors of the Federal Reserve System shall ... prescribe rules and regulations with respect to the amount of credit that may be" extended on any security "for the purpose of preventing the excessive use of credit for the purchase or carrying of securities." The House Report accompanying the original bill also clearly indicates that it was Congress' intention to give the Federal Reserve Board the power to regulate effectively the extension of credit for securities:

The main purpose of these margin provisions ... is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result will be achieved as a byproduct of the main purpose.

The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-crash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry, and agriculture, were drained by far higher rates into security loans and the New York call market.

H.R.Rep. No. 1383, 73d Cong., 2d Sess. 709 (1934).

Although the main purpose of the Congressional grant of power to the Federal Reserve Board was to give it an effective method of reducing the nation's credit resources which could be directed by speculation into the stock market, the Federal Reserve Board has also used the power to set margin rates to stimulate the market as part of its overall monetary policy. *See Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 788 n. 14 (C.A. 3, 1982). The margin rate has historically varied between 40% and 100%. When the Federal Reserve Board desires to stimulate the market, it reduces the margin requirements, and when it determines that stock market activity has been unduly stimulated by easy credit, it raises the margin requirements. *Id.* This fact is relevant in this case because it demonstrates that the Federal Reserve Board has broad discretionary power to set margin rates in order to stimulate or restrict the market. Certainly, if the Federal Reserve Board has the power to set the margin rates, then it also has the power to define the term "current market value" in order to exercise its overall monetary policy so long as there is a reasonable basis for the definition.

The Court finds that there is a reasonable basis for the Staff's opinions which conclud-

ed that a borrower who controls the corporation may value all of the margin securities at the tender offer purchase price, whether the securities were purchased in the tender offer or before because the value of the securities could include a control premium. Therefore, the Court accords substantial weight to the principles enunciated in these Staff Opinions, *see also Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565–66, 100 S.Ct. 790, 796–97, 63 L.Ed.2d 22 (1980) (deference is appropriate where the Federal Reserve Board plays a pivotal role in setting the statutory machinery in motion), and finds that there is nothing in the margin regulations which prevents JMSL from benefitting from a higher loan value that is the result of a bona fide appreciation in the market value of the pledged collateral, so long as that determination is made at the time of financing.

■ Pabst contends that $24 loan value which JMSL has placed on the Pabst common stock is not the result of a bona fide appreciation in the market value. The Court finds that this argument is without merit because Pabst, through its Board of Directors, has stated that the JMSL offer is inadequate and not in the best interest of the shareholders. This decision was based on the opinion of Pabst's investment banker, Lehman Brothers Kuhn Loeb Inc., which stated that the $24 in cash per Share offered in the JMSL offer "does not reflect fully the value of a control position of the Company." (D.I. 47, Ex. O.) Therefore, the Court finds that the proposed loan from Chemical Bank to JMSL, at this time will not violate Regulation X or U;[4] and holds that JMSL has not violated the disclosure requirements with respect to the financing agreement with Chemical Bank.

## DISCLOSURE OF THE FINANCIAL INFORMATION OF KALMANOVITZ AND JACOBS

Pabst also alleges that the Offer to Purchase contains false and misleading state-

ments concerning the tender offer financing with respect to two of the individual defendants—Kalmanovitz and Jacobs. Pabst argues that JMSL and PST are shell corporations without any substantial assets and that Kalmanovitz and Jacobs are the real bidders who are providing the necessary funding to JMSL. Pabst, thereby, asserts that the shareholders must be supplied the financial information with respect to these two individuals so that the shareholders can make an informed decision.

Pabst relies upon a SEC ruling to support its proposition that financial information of natural persons, such as Kalmanovitz and Jacobs, may be material to an investment decision by holders of a class of securities in deciding whether to tender, sell or hold such securities. Securities Act Release No. 5844 [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 81,256 at 88,379 (July 21, 1979) ("Release"). The Release deals with Schedule 14D–1 Item 9, which sets forth the obligations of certain bidders with respect to financial statements. It points out that compliance with Item 9 "is required only where the bidder is other than a natural person." *Id.* The Release, however, notes an exception to this general rule: "that under facts and circumstances of a particular tender offer, financial information concerning a bidder who is a natural person may be material to an investment decision." *Id.* n. 22. Thus, this Court must determine whether limited financial information about Kalmanovitz and Jacobs is material to Pabst shareholders who are deciding whether to hold, sell or tender their shares.

Pabst relies upon *Riggs National Bank v. Allbritton,* 516 F.Supp. 164 (D.D.C.1981) and *Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140 (C.A. 2, 1979), to support its proposition that disclosure of financial information about natural persons

---

**4.** The ultimate valuation of the Pabst common stock which will be used as collateral may only be determined at the time of financing. The Offer to Purchase sufficiently notifies the Pabst shareholders that the loan will be made in ac-

cordance with Regulation U and thus covers this contingency, in view of the fact that the current value of Pabst by a reasonable method could be $24 per share.

who are effectively the principal owners of the offeror is appropriate in this case.[5]

In *Riggs,* the defendant, an individual, made a tender offer which, if successful, would have given him control of 35% of the Riggs stock. In his Offer to Purchase, the individual offeror disclosed that he had not decided on a plan or a proposal for the repayment or refinancing of the fifty million dollar debt he had secured for his offer. The court concluded that this was the type of case in which certain financial information was material, specifically noting that it was an individual who was making the offer for shares of a national bank. The court thus required that the individual disclose his estimated net worth, the valuation of his major assets, the schedule of interest charges to be made prior to the maturity of the principal, the anticipated source of payment of the interest charges, and the other alternatives considered for the repayment of the principal amount of the loan. *Id.* at 175. The court also found that these disclosures were material because the information was significant to shareholders "evaluating the overall future of the bank." *Id.*

In *Prudent Real Estate Trust v. Johncamp Realty, Inc., supra,* the offeror, Johncamp Realty, Inc.. ("Johncamp"), was a closely held Delaware corporation which was owned by Johncamp Netherlands Antilles, N.V. ("Johncamp N.V.") (60% owner) and by the Pacific Company ("Pacific") (40% owner). Johncamp N.V., in turn, was owned by a publicly held corporation and Pacific was solely owned by an individual, John E. Wertin. Johncamp N.V. and Pacific had entered into an elaborate shareholders' agreement which provided that after the offeror's purchase of the target company's shares, Pacific would have exclusive control of the voting of shares and of the management of certain property, including the right to dispose of such property for cash. All other matters relating to the management of Johncamp would be controlled jointly by Johncamp N.V. and Pacific. 599 F.2d at 1142. The target company initiated action seeking to enjoin the offeror and individual defendants from proceeding with the tender offer. Specifically, the target claimed that the offering material failed to disclose any information about Wertin himself.[6]

The Court of Appeals for the Second Circuit agreed with the target company and held that Wertin's financials as well as his companies' financials should be disclosed because "the shareholders' agreement gave Wertin the right to vote all acquired" target shares and the power to manage the properties. *Id.* at 1147. In so holding, the court held that the financial information about Wertin was material to the shareholder to making an informed decision and discussed in detail why financial disclosure is material to the shareholders:

In applying [the test of materiality] to a cash tender offer, it is necessary to appreciate the problem faced by a stockholder of the target company in deciding whether to tender, to sell or to hold part or all of his securities. It is true that, in the case of an "any and all" offer such as that here at issue, a stockholder who has firmly decided to tender has no interest in the financial position of the offeror other than its ability to pay—a point not here at issue—since he will have severed all financial connections with the target. It is also true that in the case of such an offer, there is less reason for him to seek to eliminate the risk of being partly in

---

**5.** Pabst also relies upon *Corenco Corp. v. Schiavone & Sons, Inc.,* 362 F.Supp. 939, 949 (S.D.N.Y.1973), *aff'd in part & remanded in part,* 488 F.2d 207 (C.A.2, 1976). In *Corenco,* the offeror, Schiavone & Sons, Inc., failed to provide the shareholders of Corenco with any financial information regarding the offeror corporation. The Court found that the financial information about the offeror was material to the shareholders and enjoined the tender offer. This case does not support Pabst's proposition because the target company was not seeking the disclosure of any financial information from individuals.

**6.** The financial information of the publicly held corporation which owned Johncamp N.V. had been incorporated into Johncamp's Schedule 14D and showed that the publicly held corporation was a "company of substance." 599 F.2d at 1147.

and partly out by selling to arbitrageurs, usually at a price somewhere between the previous market and the offered price, than where the offer is for a stated number or percentage of the shares (with or without the right to accept additional shares) or is conditioned on a minimum number being obtained. Still, the shareholder of the target company faces a hard problem in determining the most advantageous course of action, a problem whose difficulty is enhanced by his usual ignorance of the course other shareholders are adopting. If the bidder is in a flourishing financial condition, the stockholder might decide to hold his shares in the hope that, if the offer was only partially successful, the bidder might raise its bid after termination of the offer or infuse new capital into the enterprise. *Per contra*, a poor financial condition of the bidder might cause the shareholder to accept for fear that control of the company would pass into irresponsible hands.

*Id.*

The Jacobs Group primarily relies upon *Raybestos-Manhattan, Inc. v. Hi-Shear Industries,* 503 F.Supp. 1122 (E.D.N.Y.1980), and *Gray Drug Stores v. Simmons,* 522 F.Supp. 961 (N.D.Ohio 1981), for its argument that financial disclosures by natural persons who are only shareholders of a bidder is immaterial under Section 14(d) & (e) of the Exchange Act. In *Raybestos,* the target company argued that the offeror should have disclosed that the offeror's Chief Executive Officer ("CEO") controlled and dominated the board of directors of the offeror. In addition, the target company contended that the CEO's financials and the disposition of his stock interest in the event of death should have been disclosed to the target's shareholders. The target company relied upon *Johncamp* claiming that the CEO was required to disclose his financials. The court, however, found that *Johncamp* was distinguishable. Specifically, it found that in *Johncamp,* Wertin had agreed to finance 20% of the tender offer and that in return he would receive the exclusive control to vote the acquired shares and the right to manage certain properties. *Id.* at 1122. The *Raybestos* court, however, found that the CEO was not independently involved in the tender offer nor personally involved in its financial arrangements. The *Raybestos* court also found that unlike *Johncamp,* where obtaining information about Wertin's interest was found to be impracticable, the CEO's information was easily obtainable in the offeror's proxy statements filed with the SEC. *Id.* The court, therefore, held that the federal securities laws did not require the disclosure of the CEO's financials.

The Jacobs Group also relies upon *Gray, supra,* 522 F.Supp. 961 (N.D.Ohio 1981). In *Gray,* the target company sought a preliminary injunction of the tender offer instituted by National City Lines Inc. ("NCL"), a Delaware corporation controlled by Contran Corporation ("Contran"), which owned 92% of NCL. Roughly 99% of Contran's outstanding stock was owned by Contran Holding Company which in turn was wholly owned by a trust established by Mr. Harold C. Simmons for the benefit of his children and his grandchildren, of which Simmons was the sole trustee. *See id.* at 962–63.

The target company claimed that Mr. Simmons' financial information should have been disclosed in the offering material. The court rejected this contention finding that "the SEC contemplated situations involving the additional financial disclosure which [the target company] seeks and decided that the financial information of non-natural persons who control a bidder *need only be disclosed when the bidder was formed for the purpose of making the tender offer." Id.* at 968 (emphasis added). It found that NCL was not a bidder formed for the purpose of effectuating a tender offer, because it was engaged in various real estate, energy and transportation operations. *Id.* at 962. Thus, the court held that there was no violation of Schedule 14D–1 Item 9. *Id.* at 968.

The Court finds that *Gray* and *Raybestos* do not undermine Pabst's position, but, in fact, support it. In both of these cases, the acquiring corporations and/or its parents,

were not created for the sole purpose of effectuating a tender offer. Furthermore, the individuals from whom the target companies were seeking disclosure were not personally involved in the financing of the transactions. These facts were significant in both the *Gray* and *Raybestos* decisions; in *Gray,* the court indicated that if the corporation had been formed for the purpose of effectuating a merger, the financials of the individual would have been required; in *Raybestos,* the court expressly distinguished *Johncamp* on the basis that the individual had no individual personal role in the tender offer.

*Riggs* and *Johncamp* also support Pabst's proposition. *Riggs* demonstrates that an individual, who is seeking to acquire shares in a tender offeror, must disclose certain financial information about himself to the shareholders. *Johncamp* extends *Riggs* because it requires an individual to disclose financial information even though a corporation is making the tender offer. The Court finds it significant that in *Johncamp,* the individual, as sole shareholder of the parent corporation, invested substantial cash in the acquiring corporation in order to capitalize the acquiring corporation so that it could proceed with the tender offer. *Johncamp,* therefore, is distinguishable from *Gray* and *Raybestos* because the latter two acquiring corporations, unlike the *Johncamp* acquiring corporation were not capitalized for the sole purpose of making a tender offer. *Johncamp* is also distinguishable from *Raybestos* because the *Raybestos* individual, unlike the *Johncamp* individual, did not have any independent financial interest in the tender offer.

█ After careful analysis of the four relevant cases cited by the parties, the Court concludes that Kalmanovitz and Jacobs should have disclosed some financial information concerning themselves, because Kalmanovitz and Jacobs are the primary motivating force behind the formation and capitalization of JMSL and PST for the effectuation of the tender offer. In the JMSL offer, the total funds required for the purchase of the Pabst common stock is estimated at 73,000,000. JMSL intends to borrow up to 49,500,000 from the Chemical Bank and the balance of the funds will be derived from approximately $25,000,000 that PST will make available to JMSL. The loan from the Chemical Bank will be secured by JMSL upon the completion of the offer with 4,140,305 shares of Pabst. These facts alone, however, do not indicate that Kalmanovitz and Jacobs are personally involved with the JMSL tender offer.

A closer examination of the method by which JMSL and PST will be capitalized demonstrates that Kalmanovitz and Jacobs are in a similar position as that of the individual in *Johncamp* because they are the ones responsible for capitalizing JMSL through PST for the express purpose of effectuating a tender offer by using their personal finances. This is demonstrated by the facts disclosed in the Offer to Purchase, which clearly states that both JMSL and PST were recently organized and that the only present business is in connection with making the tender offer and holding Pabst's shares. Moreover, at the present time, JMSL has been capitalized with only $1,000. The required capital which PST and JMSL need to complete the tender offer will be transferred only upon the acceptance of payment of Pabst common stock pursuant to the offer. Thus, these facts clearly show that both PST and JMSL were created and capitalized for the sole purpose of consummating the tender offer.

The Offer to Purchase also clearly states that the shares which Jacobs transferred to PST will be free of the $3,345,000 margin debt because PST will repay it from the cash it receives from the Jacobs Group ($2,370,000) and Kalmanovitz ($26,395,000). After PST transfers the shares and the cash to JMSL, PST will be indebted to Kalmanovitz for $9,500,000 and to Jacobs for $9,500,000. These sums represent partial consideration for the Kalmanovitz cash investment and Jacobs' transfer of Pabst stock. These facts clearly indicate that Kalmanovitz and Jacobs, like the individual in *Johncamp,* have personally invested substantial capital in order to capitalize the tender offer by the

acquiring corporations. Thus, there is no question that Kalmanovitz and Jacobs are the dominant and motivating principals behind the JMSL tender offer.

Nor is there any question that the disclosure of some financial information concerning these individuals is material to the shareholders. Both Kalmanovitz and Jacobs will incur substantial indebtedness if the JMSL tender offer is successful. Kalmanovitz presently intends to borrow $18,-400,000 from the Seattle-First National Bank and has already borrowed $4,000,000 from each of Pearl Brewing Company and S & P Company to finance his cash investment in PST. Both of these latter loans are payable in one year and Kalmanovitz has disclosed that he presently intends to repay the loans from other personal assets, without providing any other details. Jacobs has disclosed that his margin debt on the Pabst shares totaling $6,843,460 will be reduced to $3,345,000 by an unsecured loan from the Northwestern National Bank of Minneapolis ("Northwestern"). Furthermore, Northwestern intends to lend the Jacobs Group the $2,370,000 needed to capitalize PST. The Northwestern loan to Jacobs will mature on October 31, 1983, unless a merger is not consummated within six months, in which case, the loan will be due after six months. Jacobs has disclosed that he anticipates that he will be able to refinance these obligations when due to the extent that the debt is not discharged from other personal assets or from distributions or advances from PST. Jacobs has also disclosed that if the refinancing is not available, he may sell his shares in PST or seek to cause JMSL to sell its Pabst shares.

Kalmanovitz and Jacobs thus will incur substantial indebtedness if the JMSL tender offer is consummated. The Offer to Purchase also indicates that Kalmanovitz will, and Jacobs may, use their personal assets to repay their personal loans. Yet, neither of these individuals have disclosed any information as to their financial status.

This information is material because there is a substantial likelihood that reasonable shareholders of Pabst would consider the disclosure important in deciding whether or not to tender their shares. When confronted with such a decision, a reasonable shareholder would want to know whether the individuals who are the primary motivating forces behind the consummation of the tender offer will have sufficient resources to pay their debtors. For example, the shareholder would want to know whether the individuals are so financially strapped as to raise the probability that they will be pressured into a compromising position in order to avoid default; or whether they have sufficient capital to permit them to make decisions based on the merits of the transaction and be able to fulfill their fiduciary obligations. Therefore, some financial information concerning Kalmanovitz must be disclosed.

The Court is well aware that it must be prudent with the amount of information which it will require Kalmanovitz and Jacobs to disclose. It does not believe that individuals are required to lay out their entire balance sheet. Thus, the Court holds that the information which it will require to be disclosed is only that information which is necessary to give the shareholder an opportunity to make an informed choice. Therefore, the Court concludes that the following additional information should be provided to the shareholders: (1) a certified estimate of the net worth of both Kalmanovitz and Jacobs, or in lieu thereof, a verified statement by each individual that he has an estimated personal net worth of at least $250,000,000; [7] (2) a certified estimate of the value of the personal assets which secured Kalmanovitz' loan of $18,400,000 from Seattle-First National Bank, and a statement of the anticipated source of the interest payments which may be due prior to the maturity of that loan; (3) a certified statement by Jacobs of personal loan or loans from the Northwestern National Bank of Minneapolis and a statement of the

---

**7.** Kalmanovitz, at oral argument on November 15, 1982, stated that he was willing to disclose

that his net worth exceeds $250,000,000.

anticipated source of interest payments which may be due prior to the maturity of that loan or loans.

OTHER ALLEGED MISREPRESENTATIONS AND/OR OMISSIONS

Pabst argues that Kalmanovitz and Jacobs have failed to disclose their plans and proposals for the future management of Pabst. It relies upon Item 5 of Schedule 14D-1, 17 C.F.R. § 240.14d-100 (1982), which requires that plans and proposals of the bidder should be disclosed to the shareholder. It alleges, among other things, that:

It is obvious that Kalmanovitz's undisclosed plans include the shut-down of Pabst's plants in Milwaukee and Newark, given that Kalmanovitz's presently-owned brewing companies have underutilized plans [sic] near these locations. It may also be assumed that Jacobs will then sell off Pabst's non-brewing assets and the rest of Pabst's brewing assets will be integrated with Kalmanovitz's other brewing companies. Yet the Offer to Purchase contains not a word on this subject.

D.I. 17 at 10. If these facts were proved, then perhaps the Court would find that there was a material omission. Pabst, however, has neither proved that Kalmanovitz and Jacobs have these plans nor proved the existence of any other material plans, other than the ones that have been disclosed in the Offer to Purchase. In fact, in deposition, both Kalmanovitz and Jacobs have stated that they have not formulated any specific plans other than what has been disclosed in the offering material. (See D.I. 44 at 112 (Deposition of Kalmanovitz); D.I. 51 at 71 (Deposition of Jacobs).)

Pabst also alleges that Kalmanovitz and Jacobs were required to disclose their general business philosophy to the Pabst shareholders. Pabst contends that Kalmanovitz has a long history in the beer industry, controlling four different brewing companies, and that "it simply defies reason that he would seek control of a major beer company" without plans for the company once he gains control. (D.I. 17 at 8.) According

to Pabst, Kalmanovitz's business practices are well known to Pabst and others in the beer industry. It contends that Kalmanovitz believes "in eliminating advertising, reducing volume, finding ways to circumvent wholesalers and distributors and, in general, emphasizing short term profits at the expense of long term viability." (Id. at 8–9.) Pabst also claims that Jacobs is known as a liquidator and should have been disclosed as such to the Pabst shareholders. Pabst claims that this information is material to the shareholder because it is "obvious" from their business philosophy that Kalmanovitz and Jacobs will pursue the same course in Pabst as they have done in the past.

■ The Court disagrees with Pabst. Pabst has not proved the likelihood that Kalmanovitz will impose the business strategy that he has used in other beer companies upon Pabst if he assumes control. The mere fact that he operates other companies in a particular way does not necessarily mean that he will operate Pabst in that same manner. The companies are presumptively different, each having its own business environment. Nor has Pabst proven that Jacobs is likely to liquidate Pabst merely because he has liquidated other companies in the past. Because Pabst has not demonstrated that Kalmanovitz and Jacobs invariably act or have a high probability that they will act in a certain manner, the Court concludes that the alleged business philosophies of these men with respect to Pabst are too speculative to require disclosure.

■ Pabst also contends that the Offer to Purchase failed to make full and accurate disclosure with respect to the integrity of Kalmanovitz. The offer does disclose that the United States District Court for the District of Columbia permanently enjoined Falstaff and Kalmanovitz from engaging in conduct violative of various federal securities laws. Thus, Pabst argues that the Offer to Purchase is materially misleading by disclosing that the court "found that Falstaff and/or Kalmanovitz had violated" the securities laws in connection with a proxy solicitation. Although

the Court of Appeals for the District of Columbia stated that the district court had found that both Falstaff *and* Kalmanovitz had violated the federal securities law, *see SEC v. Falstaff Brewing Corporation,* 203 U.S.App.D.C. 28, 629 F.2d 62, 65 (1980), this Court concludes that the JMSL misstatement is not material. There is not a substantial likelihood that a reasonable shareholder would consider this distinction important in deciding on how to vote, in view of the fact that the Offer to Purchase also disclosed that both Falstaff and Kalmanovitz were enjoined from further actions which would violate the securities law.

The Court has considered Pabst's remaining disclosure claims and has concluded that they are without merit. Specifically, the Court finds that the Offer to Purchase has sufficiently disclosed Kalmanovitz's and Jacobs' previous violations of the law, noting that approximately five pages of the Offer to Purchase discusses these violations. Therefore, the Court holds that the Offer to Purchase, except for the failure to disclose limited financial information of Kalmanovitz and Jacobs, does not violate Sections 14(d) & (e) of the Exchange Act.

## STANDARDS FOR GRANTING A PRELIMINARY INJUNCTION

■■ The Court having determined that the Offer to Purchase omitted material information relating to the financial status of Kalmanovitz and Jacobs in violation of the federal securities laws, it becomes important to restate the standard to be applied in determining whether a preliminary injunction should issue against the consummation of the Jacobs Group tender offer. In order for a preliminary injunction to issue, the settled rule of this Circuit requires the moving party to demonstrate:

(1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. . . . Moreover, while the burden rests upon the moving party to make these requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested

persons from the grant or denial of the injunction, and (4) the public interest". . . . While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a "delicate balancing" of all elements. On the basis of the data before it, the district court must attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing.

*Eli Lilly and Co. v. Premo Pharmaceutical Laboratories Inc.,* 630 F.2d 120, 136 (C.A.3), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980) (*quoting Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (C.A.3, 1978)); *A.O. Smith v. FTC,* 530 F.2d 515 (C.A.3, 1976).

■ Applying these factors *seriatum,* Pabst has shown, as previously discussed, that there is a reasonable probability that the Jacobs Group has violated Sections 14(d) and (e) in failing to disclose material financial information concerning Kalmanovitz and Jacobs.

Second, the Court finds that Pabst and its shareholders will suffer irreparable harm if a preliminary injunction is not granted. The record is clear that if the consummation of the tender offer is not enjoined that approximately $72,000,000 may be disbursed to an undeterminate number of selling shareholders. Thus, if the tender offer is consummated, it will be virtually impossible for this Court to undo the transaction which would leave the plaintiff and its shareholders without an adequate remedy at law.

Third, the only parties who may be injured by a limited injunction would be the members of the Jacobs Group, but their injury will be minimized by the fact that the Court will only enjoin the consummation of the tender offer in the event that supplemental and corrective disclosures are not mailed on or before November 22, 1982, to Pabst shareholders—a date which is five days from the issuance of the injunction and four days prior to withdrawal date of the Jacobs' tender offer.

Finally, the public interest will be served by granting injunctive relief because it will enforce the mandated purposes of the Williams Act which requires disclosure of all material information during the course of a tender offer.

An order will be entered in accordance with this opinion.