**REVLON, INC., a Delaware corporation, Plaintiff,**

v.

**PANTRY PRIDE, INC., a Delaware corporation, MacAndrews & Forbes Holdings Inc., a Delaware corporation, MacAndrews & Forbes Group, Incorporated, a Delaware corporation, MacAndrews & Forbes Acquisition Corporation, a Delaware corporation, Nicole Acquisition Company, a Delaware corporation, Chemical New York Corporation, a Delaware corporation, and Chemical Bank, a New York corporation, Defendants.**

Civ. A. No. 85–497 JJF.

United States District Court, D. Delaware.

Sept. 12, 1985.

Paul Vizcarrando (argued), of Wachtell, Lipton, Rosen & Katz, New York City, Stephen F. Black (argued), of Wilmer, Cutler & Pickering, Washington, D.C., A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff.

Michael W. Mitchell (argued), Samuel Kadet, Rodman Ward, Jr., and Stephen P. Lamb, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendants Pantry Pride, Inc., MacAndrews & Forbes Holdings, Inc., MacAndrews & Forbes Group, Inc., MacAndrews & Forbes Acquisition Corp., Nicole Acquisition Co.

Douglas Broadwater (argued), of Cravath, Swaine & Moore, New York City, R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, Del., for defendants Chemical New York Corp. and Chemical Bank.

## OPINION

FARNAN, District Judge.

Plaintiff, Revlon, Inc. ("Revlon"), filed a complaint pursuant to 15 U.S.C. §§ 78g, 78m, 78n and 28 U.S.C. §§ 1331 and 1337 seeking preliminary injunctive relief against defendants Pantry Pride, Inc. ("Pantry Pride"), MacAndrews & Forbes Holdings, Inc. and MacAndrews and Forbes Group, Inc. (collectively "MacAndrews & Forbes"), and Nicole Acquisitions ("Nicole") (Pantry Pride, MacAndrews & Forbes, and Nicole will be referred to as the "Pantry Pride Group"), from commencing a tender offer by Pantry Pride for any and all of Revlon's shares. Revlon also seeks to have defendants enjoined (a) from filing or disseminating any false or misleading Schedule 14D-1 statements, offering materials or other documents relating to purchases of Revlon shares by defendants, or (b) from using or attempting to use any shares of Revlon stock to control or affect the management of Revlon.

It appears from Revlon's brief that Revlon also seeks an order pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that Chemical New York Corporation and Chemical Bank (collectively "Chemical") are "bidders" and part of a "group" as defined in 15 U.S.C. § 78n (1981) and, therefore, subject to the disclosure requirements of 15 U.S.C. § 78n. Revlon also seeks injunctive relief against Chemical Bank, barring them from issuing a loan to Pantry Pride, on the ground that such a loan would violate Section 7 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78g (1981), and the regulations thereunder.

Revlon, in its Second Amended and Supplemental Complaint (Docket Item 60), has alleged seven causes of action. The first and second are disclosure claims under Sections 14(d) and 14(e) of the Exchange Act. The third alleges tipping of the tender offer plans to market professionals and arbitrageurs, in violation of Section 14(e) of the Exchange Act, and Rules 14e-3(a) and 14e-3(d)(1). The fourth claims tortious interference in Revlon's business and contractual relationships. The fifth alleges that the proposed financing for the tender offer violates the margin requirements set forth in Section 7 of the Exchange Act and Regulations G, U and X thereunder. The sixth alleges that Chemical has violated the dis-

closure requirements of Sections 14(d) and 14(e) of the Exchange Act and the rules and regulations thereunder. The seventh and final cause of action alleges that the Pantry Pride Group knowingly and intentionally engaged in a pattern of racketeering activity, by multiple acts of securities fraud, in violation of 18 U.S.C. § 1962. Revlon, at this time, seeks a preliminary injunction on all of the claims except the third and fourth (i.e.) the tipping violations and tortious interference claims.

## I. BACKGROUND FACTS

On August 19, 1985, Pantry Pride publicly announced its intention to make a tender offer for any and all of Revlon's shares at $47.50 per share. Pantry Pride, through its wholly-owned shell subsidiary, Nicole, commenced a cash tender offer on August 26, 1985, pursuant to an Offer to Purchase bearing the date August 23, 1985. The Offer to Purchase generally provides that if the tender offer succeeds, and if 90% of the outstanding common and preferred stock are tendered, then Pantry Pride will effectuate a short-form merger of Revlon and Nicole or an affiliate. If less than 90% are tendered, it will effectuate a statutory merger through a vote of the Board of Directors and shareholders. The Offer notes that Pantry Pride may have to replace a majority of the Board of Directors in order to consummate a statutory merger. The Offer to Purchase further advises that Pantry Pride intends to sell substantially all of Revlon's assets, except the Beauty Group, in order to reduce the size of the merged corporation, and to service the debt it will incur in financing the tender offer. (Offer to Purchase at 18–19).

Revlon contends that the Offer to Purchase violates Sections 14(d) and (e) of the Exchange Act because it fails to disclose: (a) Pantry Pride's fraudulent offering in July 1985; (b) the unlikelihood of Pantry Pride's securing the financing to purchase the shares by the September 20, 1985 "Ex-

piration Date"; (c) that the financing procured by Pantry Pride for the tender offer violates margin regulations; (d) that Chemical is a "bidder", with substantial control over the terms of the offer, and would exercise effective control over Revlon should the tender offer succeed; and (e) material information about the finances of MacAndrews & Forbes and Ronald Perelman.[1] Revlon also maintains that the takeover attempt violates the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (1984), that the takeover is being financed in violation of Section 7 of the Exchange Act and the margin regulations promulgated by the Federal Reserve Board, and that Chemical, as a "bidder", failed to file and make required disclosures, in violation of Section 14(d)(1) of the Exchange Act. This opinion shall constitute this Court's Findings of Fact and Conclusions of Law[2] as required by F.R. C.P. Rule 52(a).

The Court will review the allegations of Revlon, first as they pertain to the Pantry Pride Group and then Chemical.

## II. PANTRY PRIDE GROUP

(Pantry Pride, Nicole, and MacAndrews & Forbes)

### A. Disclosure Violations

The Williams Act, Sections 14(d) and 14(e) of the Exchange Act, requires disclosure of all material facts "in connection with" the sale or exchange of securities. It was adopted to "insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). Rules and regulations promulgated by the Securities Exchange Commission (SEC), pursuant to Sections 14(d)(1), (d)(4), and (d)(6), specify the information that an offeror must file with the SEC, disseminate to the target compa-

---

**1.** Ronald O. Perelman is the sole stockholder of MacAndrews & Forbes, and is chairman of the board and chief executive officer of both Pantry Pride and MacAndrews & Forbes.

**2.** On September 10, 1985, Chemical filed a Motion to Dismiss, which the Court does not address in this Opinion.

ny's shareholders, and include in an "offer to purchase". (Rules 14d–4 and 14d–6). All material information must be disclosed, whether or not specifically required by Sections 14(d) and 14(e). SEC Release No. 33–5844 [1977–78 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 81,256 at 88,379 n. 22 (July 21, 1977). A material fact is a fact which " 'would have assumed actual significance in the deliberations of the reasonable shareholder' considering whether to tender his shares, [*TSC Industries, Inc. v. Northway, Inc.,*] 426 U.S. [438] at 449, 96 S.Ct. [2126] at 2132 [48 L.Ed.2d 757 (1976) ] ..." *Staffin v. Greenberg,* 509 F.Supp. [825] at 835 [ (1981) ], *quoted in Staffin v. Greenberg,* 672 F.2d 1196, 1205 (3rd Cir.1982) (adopting this definition of materiality as the governing test in actions based on Section 14(e)). However, offerors have no duty to "publicly admit the culpability of their actions." *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1490 (D.Del.1984) (referring to) *Biesenbach v. Guenther,* 588 F.2d 400, 402 (3rd Cir.1978) (a complaint effectively alleging that directors failed to disclose they breached their fiduciary duty, does not state a claim under Section 10(a) of the Security Exchange Act of 1934).

### 1. Disclosure of Pantry Pride's Interest in Revlon as an "Acquisition Candidate"

On July 12, 1985, Pantry Pride commenced a public offering (the July Offering) of $700 million in notes, debentures and exchangeable preferred stock (the "July Prospectus") which advised that the proceeds of the offering would be used primarily "to finance acquisitions of new assets and business." However, it further advised that "[n]o specific determination has been made to acquire any particular company, assets, properties or business." Plaintiff's Appendix at 43.

Revlon makes two arguments based on the July Offering. First, Revlon asserts that the Pantry Pride Group had definitely decided to acquire Revlon prior to the July Offering and that this material information

should have been disclosed in the July Prospectus. Second, Revlon maintains that the violation of SEC disclosure requirements in the July Prospectus exposed Pantry Pride to liability for damages and/or recission by purchasers of the July Securities. According to Revlon, this potential legal liability should have been more adequately disclosed in the Offer to Purchase dated August 23, 1985.

#### (a) July Offering Prospectus

In its discussion of materiality, Revlon relies upon cases from other Circuits, and from Pennsylvania and Delaware District Courts, for its blanket statement that case law requires full disclosure of the purposes, plans and intentions of a tender offeror. However, in *Staffin v. Greenberg,* 672 F.2d 1196 (3rd Cir.1982), and *Greenfield v. Heublein, Inc.,* 742 F.2d 751 (3rd Cir.1984), cases not addressed by Revlon, the Third Circuit dealt with the issue of the materiality of pre-tender offer plans in the context of preliminary merger regulations.

In *Staffin,* shareholders sued the corporation and majority shareholder for failure to disclose preliminary merger discussions. 672 F.2d at 1205. The Third Circuit held that "preliminary merger discussions are immaterial as a matter of law (because) disclosure of them may itself be misleading." 672 F.2d at 1206. The court relied on cases from other jurisdictions, testimony before the Senate Subcommittee on Securities, and statements in the American Stock Exchange Manual, for this rationale. The Senate Subcommittee testimony quoted in *Staffin* addressed the effects of premature disclosure in " 'takeover bids', that is, cash tender offers." This testimony emphasized the stock market problems and the potential loss to shareholders and the offeror when information is disclosed before the tender offer details are finalized and the offer is made. (Transcript, Hearings Before the Subcommittee on Securities of the Committee on Banking and Currency, United States Senate, 90th Congress., 1st Session, S.510, p. 72, March 22, 1967, statement of Mr. Calvin on behalf of the New York Stock Exchange, Inc.), quoted in,

*Staffin,* 672 F.2d at 1206. The court went on to note that the Williams Act Amendment, requiring public disclosure and filing with the SEC after a tender offer commences (15 U.S.C. § 78n(d)(1)), was in response to this type of testimony.

In *Staffin,* the Third Circuit did recognize that "[w]here an agreement in principle has been reached a duty to disclose does exist." 672 F.2d at 1207. In *Greenfield v. Heublein, Inc.,* 742 F.2d 751 (3rd Cir.1984), the Third Circuit again had to decide whether an "agreement in principle" had been reached, thus triggering disclosure requirements. The court affirmed the district court's determination that, as a matter of law, an agreement in principle to merge was "reached when the parties reached agreement on 'price and structure'." 742 F.2d at 757. The court reasoned that these criteria provide "concrete evidence of a mature understanding between the negotiating corporations. *They constitute a useable and definite measure for determining when disclosures need to be made ...".* *Greenfield,* 742 F.2d at 757 (emphasis provided).

■ Although the *Heublein* and *Staffin* decisions involve mergers, the standard and rationale are equally applicable to tender offer disclosures. Thus, where, as in the instant case, the offeror engages in a hostile takeover, disclosure is not required until the offeror has definitely determined to acquire the target corporation and finally decided the terms of the offer. Based on this standard, Revlon has the burden of establishing that it can prevail at trial on the issue of when Pantry Pride made the final decision to acquire Revlon.

MacAndrews & Forbes first considered Revlon as a potential acquisition target in March 1985, before it held a controlling interest in Pantry Pride. Morgan Stanley & Co., Inc. ("Morgan Stanley"), the investment banking firm, brought Revlon to MacAndrews & Forbes' attention as a possible takeover candidate. Morgan Stanley provided a written analysis of Revlon to MacAndrews & Forbes in April 1985. MacAndrews & Forbes was interested in the Beauty Group, but "uncomfortable with [its] knowledge" of the Ethical Pharmaceutical and Diagnostic Divisions. (Defendant Pantry Pride's Appendix at 12). The April 1985 portion of the Morgan Stanley analysis, valuing the various divisions, was especially important because MacAndrews & Forbes and its sole shareholder, Ronald Perelman, knew that the acquisition of Revlon would necessitate sales of some, if not most, of its assets. (Defendant Pantry Pride's Appendix at 48).

In May and June 1985, Ronald Goldstein, Assistant Vice President of Corporate Development for MacAndrews & Forbes, Inc. analyzed Revlon and thirteen other potential acquisition candidates (Goldstein Affidavit at ¶ 3). Goldstein also prepared several memoranda on the value of Revlon's various divisions for MacAndrews & Forbes, Pantry Pride and/or Perelman.[3]

In early July, MacAndrews & Forbes and Pantry Pride attempted to identify other potential acquisitions because they were not satisfied with those under consideration, including Revlon. To accomplish this identification, MacAndrews & Forbes and Pantry Pride had a series of meetings with Morgan Stanley. Both Morgan Stanley and Goldstein reviewed other companies and supplied reports on these companies to Perelman in July. Also, in late July, Perelman, still unsure of the salability and value of certain Revlon divisions, advised Morgan Stanley that he wanted to meet with possible purchasers of Revlon's assets, particularly the Ethical Pharmaceutical Division. On August 6 and 7, 1985, meetings with two British drug companies were held in London. Both companies expressed inter-

---

**3.** During this same time period, March 1985 to June 1985, MacAndrews & Forbes entered a Preferred Stock Purchase Agreement with Pantry Pride, through which MacAndrews & Forbes increased its holdings in Pantry Pride from approximately 20% to approximately 38% of all outstanding Pantry Pride shares. The stock purchase was for the purpose of using Pantry Pride as an acquisition vehicle. Thereafter, MacAndrews & Forbes held the largest block of Pantry Pride voting shares.

est, although not current interest, in purchasing Revlon's pharmaceutical division, at prices near the higher end of Morgan Stanley's value range for that division.

Pantry Pride has consistently asserted that this meeting was the turning point in its investigation of Revlon. Pantry Pride knew it had to sell this asset to service the acquisition debt. The valuations by Morgan Stanley, Drexel Burnham Lambert ("Drexel")[4] and Goldstein had various ranges, depending on when they were made. The differences in the highs and lows of those valuations was $100 million to $280 million. After meeting with the British companies, the Pantry Pride Group was more confident that it could sell the assets for a total figure adequate to service the anticipated acquisition debt.

On August 8, 1985, the Pantry Pride Group asked Chemical for a $500 million loan. Although the parties had met in July, 1985, this meeting involved a general discussion of Chemical's willingness to lend acquisition funds to Pantry Pride. On August 1, 1985, an internal Chemical report noted that Chemical had not heard from MacAndrews & Forbes regarding a possible acquisition, even though two and one-half weeks had passed since Pantry Pride raised $700 million through its July Offering of subordinated debentures.[5]

Also on August 8, 1985, the Pantry Pride Group contacted Drexel for the first time to inquire as to its interest in participating in raising funds to finance a Revlon stock acquisition.[6]

On August 14, 1985, Pantry Pride, Nicole and Chemical signed a commitment letter specifying the terms and conditions of the $500 million loan to Nicole. The terms give Chemical a "perfected first priority security interest" in all of Revlon's shares acquired by Nicole, and set forth default provisions restricting the sale, pledge or transfer of Revlon stock without Chemical's consent. (Defendant Pantry Pride's Appendix at 426–429). On August 19, 1985, Pantry Pride announced its intention to acquire Revlon by an all-cash tender offer.

During the same time period in which the Pantry Pride Group's Revlon-related activity transpired, Ronald Goldstein, Assistant Vice President of Corporate Development of MacAndrews & Forbes Group, Inc., was identifying and analyzing other potential acquisition targets. This was one of Goldstein's responsibilities. Goldstein reports directly to Bruce Slovin, President of MacAndrews & Forbes, and of Pantry Pride. Much of the documentation of the Pantry Pride Group's investigation and analysis of Revlon was prepared by Goldstein. Similar documentation was prepared by Goldstein on seven other companies he selected, and on one selected by Perelman. (Goldstein Affidavit at 4, 5).

On July 11, 1985, one day prior to the effective date of Pantry Pride's July Offering, Goldstein and Slovin met with Morgan Stanley. They advised Morgan Stanley that they had not selected an acquisition candidate for Pantry Pride and asked for a screening and review of companies with a capitalization between $400 million and $3

---

4. Morgan Stanley is the investment banking firm engaged by Pantry Pride to assist in determining an aquisition candidate. Drexel is the investment banking firm through which Pantry Pride's July 1985 debt offering was made, and through which its September 1985 debt offering is being made.

5. This document was initially submitted by Revlon under seal. However, Revlon introduced the document at argument without objection, and therefore it shall be treated as ordered unsealed.

6. Drexel had underwritten the July Securities Offering and had no knowledge at that time of any decision by the Pantry Pride Group to ac-

quire Revlon. According to Drexel, when approached by MacAndrews & Forbes in May 1985, Drexel was advised that the funds were to enable Pantry Pride to engage in "one or more substantial acquisitions." (Abecassis Deposition at 47, 57; Slovin Deposition at 81). Ten to fifteen potential acquisition targets were mentioned by MacAndrews & Forbes. Based on this information, the size of the offering was limited to $700 million (a figure not based on the full cost of a Revlon acquisition) and no vigorous investigation of any of the listed companies was undertaken by Drexel. (Abecassis Deposition at 41, 66).

billion. They requested identification of those companies most suitable for acquisition by Pantry Pride. (Goldstein at 5). Later that month, Goldstein requested Morgan Stanley to include the seven companies he had identified in his July 8, 1985 memorandum to Slovin. On July 12, 1985, Goldstein performed a detailed analysis of a company previously discussed with Morgan Stanley. On July 22, 1985, Morgan Stanley presented Pantry Pride with the results of its studies. Similarly, during the third week of July, Drexel prepared an updated report on another potential acquisition candidate.

Revlon argues that these facts are insufficient to establish that the Pantry Pride Group had *not* settled on Revlon as its acquisition candidate prior to the July Offering. Revlon points to the specificity with which Pantry Pride Group memoranda described Revlon's assets, financing costs and price per share. It treats the memoranda's use of possessive pronouns, and assignment of an internal name "Nicole" to Revlon, as substantial evidence that the Pantry Pride Group decided well before the July Offering to acquire Revlon. Thus, Revlon argues there was a material omission in the July Prospectus which stated no company had been selected for acquisition. Revlon also argues that Goldstein's Affidavit is self-serving and not supported by the type of documentation available on the Revlon investigation by Pantry Pride. Thus, Revlon concludes that it has a substantial likelihood of prevailing at trial on the issue of whether the July Prospectus had a material omission in violation of 14(d) and 14(e).

The Court disagrees with Revlon's conclusion. Regardless of the nouns and pronouns used in the Pantry Pride memoranda, the documents as a whole evidence long-term efforts to obtain reliable financial figures on which both the Pantry Pride Group and its lenders and/or investors could base their projections of Pantry Pride's ability to service its debt. The testimony provided by Goldstein's Affidavit further supports the conclusion that, although Revlon might have been the front-running acquisition candidate even before the July Prospectus and Offering, its position was not assured until after the Pantry Pride Group structured the financing for the tender offer in August 1985. The fact that the hypothetical and actual cash price per share are the same is not persuasive. Even if the Pantry Pride Group had decided in May or June 1985 that in an acquisition of Revlon they would pay $47.50 per share, that decision would have been immaterial until the decision to actually acquire Revlon was made. Where large scale corporate investments are planned, it is logical that projections be based on some figure representing an approximation of the price per share to be offered. Once the projections are made, a financial package structured, and the decision to acquire finalized, it is also logical that the actual price per share offered would be the same as or close to that on which the financial analyses were based.

Furthermore, the Court finds that Goldstein's failure to attach documentary evidence of the analyses of other acquisition candidates is not fatal. Although the Court did not avail itself of the opportunity to review those documents *in camera,* it finds that Goldstein's Affidavit is supported by depositions taken of John W. Tarbell, Jr. and Colleen P. Quinn of Chemical, and David P. Kay of Drexel. In addition, based on the documents submitted, the analysis of Revlon continued into August, well past the issuance of the July Prospectus and commencement and closing of the July Offering. Thus, the documents submitted indicate no final decision was made until after the pertinent July dates.

Given these facts, Revlon has not demonstrated a substantial likelihood of success in its allegations that the July Prospectus violated 14(d) and 14(e) by failing to disclose its "plan" to acquire Revlon. On the contrary, the facts indicate that the Pantry Pride Group had not reached an internal decision as to "price and structure". *Greenfield,* 742 F.2d at 757. As the *Greenfield* court stated, any disclosure

prior to the July Offering "would have been subject to change at any time. As the situation evolved, successive, possibly cancelling, announcements might have been required. This would have tended to confuse and mislead, rather than enlighten, the investigating public." *Id. citing Staffin,* 672 F.2d at 1206–07. Therefore, the Court concludes that Pantry Pride was under no duty to disclose its activities related to Revlon in the July Offering.

### (b) *Offer to Purchase Revlon Shares*

Revlon asserts that the alleged disclosure defects in the July Prospectus should have been disclosed in the August 23, 1985 Offer to Purchase sent to Revlon shareholders. However, as indicated above, Revlon has not carried its burden of showing that Revlon was the only company being investigated by Pantry Pride prior to the July Offering, thus such a disclosure was not required in the Offer to Purchase. Furthermore, even if Revlon had carried this burden, the Court finds that the disclosure made in the Offer to Purchase was adequate.

In the Offer to Purchase, at page 16, Pantry Pride discloses the allegations in this complaint. It states in part:

> On August 19, 1985, the Company filed an unverified complaint in the United States District Court for the District of Delaware against Pantry Pride and MacAndrews & Forbes. The unverified complaint alleges, among other things, that (a) in July 1985 Pantry Pride determined to make a public offering of $700 million of Pantry Pride Securities the proceeds of which were in substantial part to be used for a tender offer for the Company; (b) the prospectus for that offering was intentionally false and misleading in that it failed to disclose that (i) proceeds from the offering were intended to be used for the acquisition of the Company and (ii) at least $200 million of the proceeds were being raised to satisfy Drexel Burnham's needs, not Pantry Pride's, in that it was raised to enable Drexel Burnham to sell off at least $200 million of Drexel Burnham's own "inventory" of "junk bonds" to Pantry Pride; and (c) as a result of the allegedly false prospectus, the sales of Pantry Pride Securities made by Pantry Pride pursuant to the offering were subject to rescission by purchasers of such securities and Pantry Pride is subject to liability for significant amounts of damages.

> *      *      *      *      *      *

> Pantry Pride believes these allegations to be materially false. No purchaser of any of the Pantry Pride Securities has commenced a lawsuit challenging the accuracy of the prospectus. If such a lawsuit were even brought by a party with legal standing to pursue such claim, if a trial on the merits were held, if all appeals were exhausted and if it were ever determined that there was any material false statement or omission in the prospectus, Pantry Pride might be subject to an indeterminable number of rescission demands or an indeterminate damages judgment unless the suit had previously been settled. Since no such suit has been brought, it is impossible to estimate how long the litigation of such a case might take. Pantry Pride has been advised by counsel that such a case would in all likelihood take well over a year and probably substantially longer before it would be finally decided.

(Offer to Purchase at 16).

■ Where there is a genuine and vigorous dispute as to the fact that illegal conduct occurred, only a good faith disclosure of the issue and the possible liability of the offeror is required by the Williams Act. *Avnet, Inc. v. Scope Industries, et al.,* 499 F.Supp. 1121, 1124–1126 (S.D.N.Y.1980), relying on *Copperweld Corp. v. Imetal,* 403 F.Supp. 579, 606 (W.D.Pa.1975), and *Ronson Corp. v. Liquifin Aktiengesellschaft,* 370 F.Supp. 597, 608 (D.N.J.), *aff'd per curiam,* 497 F.2d 394 (3rd Cir.), *cert. denied,* 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974). In *Avnet,* the plaintiff corporation alleged the defendant corporation violated Rule 10b–5 by failing to disclose that it was an unregistered investment compa-

ny, and thus, *"in fact* in violation of the Investment Company Act."  499 F.Supp. at 1124 (emphasis by the court).  The defendant disputed that it was an unregistered investment company.  It had disclosed the plaintiff's allegation and possible consequences, but had denied the allegation.  The court held accurate disclosure did not require admission of guilt where guilt was vigorously disputed.  *Id.* at 1124–25.  Similarly, in *Copperweld,* the court held that a tender offeror need only disclose the possibility of antitrust violations if the offer succeeded, not admit guilt.  402 F.Supp. at 606.

▇ Pantry Pride's disclosure clearly sets forth the claims made by Revlon, as well as the possibility of recission or damages should purchasers of the July Securities initiate and prevail in a lawsuit.  That Pantry Pride reported that no such lawsuits were filed, and that any suit would require at least a year to litigate, are accurate statements which do not undermine the adequacy of the disclosure.  As the cases indicate, Pantry Pride is not required to admit liability.  Thus, the statement that "Pantry Pride believes these allegations to be materially false" does not make the disclosure inaccurate.  Therefore, Revlon has not met its burden of showing that there is a substantial likelihood that it could prevail on the merits of this claim at trial.

## 2. Disclosure of the September 20, 1985, "Expiration Date"

Revlon argues that the Expiration Date of September 20, 1985, is unrealistic, and thus inaccurate.  It further maintains that Pantry Pride's disclosure of the conditions under which the date would be extended, do not cure this inaccuracy.  This argument is premised upon the assertion by Revlon that Pantry Pride will not have all of the financing necessary to consummate the tender offer until after September 20, 1985.

▇ On page 1, paragraph 2, of the Offer to Purchase, Pantry Pride sets forth, in bold print, the following facts:  (a) shares will be purchased only if sufficient financing is in place prior to the Expiration Date to permit the purchase of all of Revlon's shares;  (b) Pantry Pride intends to register for a $900 million debt securities offering;  (c) the proceeds of that future offering are required to acquire the shares and pay acquisition fees and expenses;  and (d) Pantry Pride has the right to seek alternate forms of financing.  Thereafter, on page 12, Section 10, "Source and Amount of Funds", the Offer to Purchase again sets forth in bold letters the condition that Pantry Pride obtain sufficient funding.  That section discusses the various forms of financing structured into the acquisition plan.  Finally, in Section 14, "Certain Conditions of the Offer", Pantry Pride reiterates this condition and lists it as one of several conditions which could postpone the purchase of the shares.  Based on these disclosures, the Court finds that the conditional nature of the "Expiration Date" of September 20, 1985, is adequately disclosed pursuant to 14(d) and 14(e).

## 3. Disclosure of Financial Information on MacAndrews & Forbes and Perelman

Revlon alleges that MacAndrews & Forbes and Perelman are under a duty to disclose financial information because they are in control of Pantry Pride.  Perelman owns 100% of MacAndrews & Forbes, which owns approximately 38% of Pantry Pride.  Pantry Pride is the parent and sole shareholder of Nicole, the acquiring corporation.  In addition, Pantry Pride's August Offer to Purchase Revlon shares discloses that MacAndrews & Forbes and Perelman are "in a position to exert substantial control over Pantry Pride, including the ability to influence Pantry Pride to undertake most corporate action."  (Offer to Purchase, at 10).

Revlon relies upon *Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140 (2nd Cir.1979);  *Pabst Brewing Co. v. Kalmanovitz,* 551 F.Supp. 882 (D.Del. 1982);  and *Riggs National Bank v. Allbritton,* 516 F.Supp. 164 (D.D.C.1981).  However, Revlon's reliance on these cases

is misplaced. In all three cases, the decision regarding the defendant's failure to disclose financial information was based on whether the defendant participated financially in the offer and, therefore, was a bidder. *Prudent*, 552 F.2d at 1142–44; *Pabst*, 551 F.Supp. at 892–893; *Riggs*, 516 F.Supp. at 171. *See also Gray Drug Stores, Inc. v. Simmons*, 522 F.Supp. 961, 966–968 (N.D.Ohio 1981). Such a finding is necessary here, in order for Revlon to prevail, because SEC rules require disclosure by the bidder or offeror, and the bidder's parent if the bidding corporation was formed as an acquisition vehicle. 17 CFR § 240.14d–100, Item 9. Thus, to be subject to disclosure requirements, MacAndrews & Forbes and Perelman must be bidders, since Pantry Pride is the parent of Nicole, the acquiring corporation.

A bidder is defined as "any person who makes a tender offer or on whose behalf a tender offer is made ...". 17 CFR § 240.14d–1(b)(1). Based on the cases relied upon by Revlon, MacAndrews & Forbes and Perelman do not satisfy this definition, since neither capitalized Nicole with their funds. *Pabst*, 551 F.Supp. at 892–893. Nor is there any evidence that they offered their funds to Nicole to assist in the instant purchase. *Prudent*, 559 F.2d at 1142. Their status as Pantry Pride's majority shareholders (MacAndrews & Forbes directly, and Perelman beneficially), without evidence of financial participation, is insufficient to make them bidders. Thus, Revlon has not demonstrated that it has a substantial likelihood of prevailing on the merits of its claim that the Offer to Purchase failed to disclose financial information about these parties.

### B. Margin Issues

Revlon alleges that the proposed financing for the Pantry Pride Group's tender offer violates the margin regulations promulgated under Section 7 of the Exchange Act, 15 U.S.C. § 78g.

Revlon asserts that it has a private right of action for injunctive relief enforcing these margin regulations against the defendants.

Revlon also contends that Pantry Pride's failure to disclose margin violations of itself and others violates § 14(e) of the Williams Act. Although the nature of the alleged violations differ, Revlon contends violations of Regulations G, U and X, which will be discussed hereafter.

### 1. Standing—Private Right of Action

It is settled in this circuit that there is no private right of action under Section 7 of the Exchange Act or the regulations thereunder. *Walck v. American Stock Exchange Inc.*, 687 F.2d 778, 788 (3rd Cir. 1982).

Although Revlon cannot maintain a private action on the margin regulations directly, it does have standing to allege failure to disclose margin violations. *Alaska Interstate Co. v. McMillian*, 402 F.Supp. 532, 554 n. 28 (D.Del.1975); *Pabst Brewing Co. v. Kalmanovitz*, 551 F.Supp. 882, 885 (D.Del.1982). Thus, the court must determine whether these regulations were in fact violated.

### 2. Regulation G

Regulation G, promulgated by the Federal Reserve Board under Section 7 of the Exchange Act, provides in pertinent part:

No lender ... shall extend any purpose credit, secured directly or indirectly by margin stock in an amount that exceeds the maximum loan value of the collateral securing the credit ...

12 CFR § 207.3(b) (1985). The maximum loan value of any margin stock is set at 50% of its current market value. 12 CFR § 207.7. Therefore, in order for the September Securities Offering[7] to violate Regulation G, (1) the purchasers of the securities must be "lenders" within the Board's definition, (2) the purpose of the offering must be to buy Revlon stock, (3) the debt

---

**7.** August 28, 1985, Pantry Pride filed a registration statement with the SEC for a September public offering of debt securities (hereinafter September Securities Offering).

must be secured directly or indirectly by Revlon stock, and (4) the amount of the debt must exceed 50% of the market value of the Revlon stock. The disputed issues between the parties are, first, whether the purchasers of the September securities are "lenders", and second, whether the securities are directly or indirectly secured by Revlon stock.

Regulation G defines "lender" to include every person who, in the ordinary course of business, extends credit secured directly or indirectly by margin stock in the amount of $200,000 or more in any calendar quarter. 12 CFR §§ 207.2(h), 207.3(a). However, the Federal Reserve Board staff has explicitly exempted purchasers of public offerings of debt securities from the definition of "lender" under Regulation G. *See, e.g.,* 2 Fed.Res.Reg.Serv. 5–993 (October 12, 1979); 2 Fed.Res.Reg.Serv. 5–927 (October 18, 1978); 2 Fed.Res.Reg.Serv. 5–372 (March 26, 1974). Such public debt offerings have been construed not to involve the kind of extension of credit intended to be regulated by Section 7 of the Exchange Act, regardless of the purpose of that debt. *See,* 2 Fed.Res.Reg.Serv. 5–591 (March 24, 1978).

Revlon does not dispute the Board's interpretation. Rather it asserts that the public offering exception does not apply to the September Securities Offering, because Pantry Pride has imposed a minimum purchase requirement of $2.5 million on the offering. It asserts that this high minimum purchase requirement will assure that the $200,000 quarterly minimum will be met, thus all buyers would be within the definition of "lender" in the absence of the public offering exception. It asserts that the staff opinions contemplate "true" public offerings, and not the "nominal" public offering at issue here.

■ The Court believes, as a matter of public policy, there is much to commend Revlon's position. It is apparent that the Pantry Pride Group has taken advantage

of a possible oversight on the part of the Board in formulating the public offering exception to the margin regulations. However, it is not the role of this Court to engage in the rulemaking activities delegated by Congress to the Federal Reserve Board. The Board and its staff bear primary responsibility for interpreting the Exchange Act, and this Court will accord substantial weight to the staff's opinions. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); *Pabst Brewing Co. v. Kalmanovitz,* 551 F.Supp. 882, 889 (D.Del.1982). Therefore, the Court finds that the Pantry Pride Group's September Securities Offering does not violate Regulation G, because it is a public debt offering exempt from the margin regulations.[8]

### 3. Regulation U

Revlon asserts the Chemical loan to Pantry Pride violates Regulation U, 12 CFR § 221 *et seq.* Any duty of Pantry Pride to disclose a violation of Regulation U must be predicated upon a finding that the Chemical loan in fact was violative of Regulation U.

The Court fully discusses the Chemical loan, *infra,* and concludes there is no violation of Regulation U. Therefore, Pantry Pride had no duty to disclose.

### 4. Regulation X

Regulation X provides:

Any borrower who wilfully causes credit to be extended in controvention of Regulation G, T, or U ... must conform the credit to the margin regulation that applies to the lender.

12 CFR § 224.3(b).

In order to find that the Pantry Pride Group violated Regulation X, the Court must find that credit was extended in violation of Regulations G or U. Since the Court has found no violations of those Reg-

---

**8.** In light of this finding, the Court need not reach Revlon's claim that the offering is directly

or indirectly secured by Revlon stock.

ulations, the Pantry Pride Group cannot be found to have violated Regulation X.

### C. RICO Violation

■ Revlon claims that the Pantry Pride Group's alleged acts of securities fraud constitute a violation of §§ 1962(b) and (d) of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, and that Revlon is entitled to an injunction as an injured party under § 1964(c). *See, Aetna Casualty and Surety Co. v. Liebowitz*, 570 F.Supp. 908, 909–911 (E.D.N.Y.1983).

Section 1962(b) of RICO provides that:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire ... directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Section 1961(1) includes "fraud in the sale of securities" among the acts that constitute "racketeering activity". Section 1961(5) defines "pattern of racketeering activity" as the commitment of two or more racketeering acts within a ten year period. Section 1962(d) makes it unlawful for any person to conspire to violate Section 1962(b).

Revlon's RICO claim is substantially identical to its claims under the Williams Act disclosure requirements and the Exchange Act margin regulations. Since the Court can find no probability of success on those claims, Revlon can show no probability of success under RICO. Thus, the Court need not reach the issues of whether Revlon can maintain a private action for injunctive relief under Section 1964(c), or whether the Pantry Pride Group's alleged securities violations rise above a "garden variety" fraud claim to state a viable claim under RICO. *See, Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1497–98 (D.Del.1984).

### III. CHEMICAL—MARGIN ISSUES

#### A. Regulation U

■ Revlon has alleged that the Chemical loan in the amount of $500 million will violate Regulation U and that Chemical has "arranged" the Pantry Pride Group's financing, in further violation of Regulation U.

Regulation U provides, in pertinent part:

No bank shall extend any purpose credit, secured directly or indirectly by margin stock, in an amount that exceeds the maximum loan value of the collateral securing the credit ...

12 CFR § 221.3a (1985).

It is undisputed that Chemical Bank's loan to Pantry Pride will be directly secured by any Revlon stock that the Pantry Pride Group purchases. Revlon concedes that the Chemical loan, standing alone, is adequately margined.[9] However, Revlon asserts that the loan value of the Revlon stock Pantry Pride seeks to acquire must be shared with the $900 million of debt Pantry Pride anticipates from the September Securities Offering, since the September Offering is also indirectly secured by the Revlon stock. Thus, when these two debts are combined, the Chemical loan violates the margin requirements of Regulation U.

For this claim to succeed, the Court must find that the September Offering is indirectly secured by Revlon stock. However, the September Offering, as a public offering, is exempt from the margin regulations and, thus, it cannot be directly or indirectly secured by Revlon stock within the requirements of Regulation U. *See* 2 Fed.Res.Reg.Serv. 5–993; 2 Fed.Res.Reg.Serv. 5–927; 2 Fed.Res.Reg.Serv. 5–372.

#### B. Chemical as a "Bidder"

Revlon alleges that Chemical bank is a "bidder" in the tender offer for Revlon's stock, and has thus violated the filing and

---

**9.** Chemical Bank is committed to loan the principle sum of $500 million to Nicole. The acquisition plan calls for the purchase of $1.85 billion worth of Revlon stock. Thus, the maximum loan value of this stock under the margin regulations is 50% of $1.85 billion, or $925 million.

disclosure requirements of Section 14(d)(1) of the Exchange Act.

Section 14(d)(1) of the Exchange Act provides in pertinent part:

It shall be unlawful for any person directly or indirectly, ... to make a tender offer for ... any class of any equity security ... if after consummation thereof such person would, directly or indirectly, be the beneficial owner of more than five percentum of such class, unless ... such person has filed with the Commission a [Schedule 14d–1] statement ...

15 U.S.C. § 78n(d)(1).

A "bidder", for purposes of this disclosure requirement, is defined as "any person who makes a tender offer or on whose behalf a tender offer is made ...". 17 CFR § 240.14d–1(b)(1). Revlon asserts that the provisions of Chemical Bank's loan to Pantry Pride will give Chemical Bank control over the terms of Pantry Pride's tender offer, as well as a direct interest in the Revlon stock tendered in the form of a perfected first priority security interest. Revlon also asserts that Chemical Bank, in conjunction with the Pantry Pride defendants, constitutes a "group" formed for the purpose of making a tender offer, within the provisions of Section 14(d)(2).

Revlon has shown no probability of success on this claim. According to Revlon's own assertions, the only direct interest Chemical Bank has in the Revlon stock is its perfected security interest. Chemical has no right to act upon this interest until such time as a default occurs by Pantry Pride pursuant to the loan agreement. Even in that event, its interest in the Revlon stock is limited to recovering the amount of its loan. Also, Chemical cannot be considered part of a "group" formed for the purpose of acquiring Revlon stock, since it would not be the "beneficial owner" of any such stock within the meaning of Section 14(d)(1).

It is apparent that Chemical's interest in this matter is solely that of a commercial lender providing funds to finance Pantry Pride's tender offer. Nicole, not Chemical, is the sole purchasing entity of all Revlon stock. *See Gray Drug Stores, Inc. v. Simmons,* 522 F.Supp. 961, 967 (N.D.Ohio 1981). Pantry Pride also assumes all responsibility for repayment of the Chemical loan. *See Riggs National Bank v. Allbritton,* 516 F.Supp. 164, 171 (D.D.C.1981). In these circumstances, the Court cannot find that Chemical could be considered a "bidder".

### C. Arranging Credit

Section 221.3(a)(3) of Regulation U provides:

No bank may arrange for the extension or maintenance of any purpose credit, except upon the same terms and conditions under which the bank itself may extend or maintain purpose credit under this part.

12 CFR § 221.3(a)(3).

Revlon asserts that Chemical Bank has "arranged" the September Securities Offering in violation of Regulation U. However, since public offerings are exempt from the margin regulations, the September Offering cannot constitute an "extension of credit" within Regulation U.

### IV. SUMMARY

The Court of Appeals for the Third Circuit has consistently identified four factors which must be established in ascertaining the propriety of injunctive relief:

(1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted ... Moreover, while the burden rests upon the moving party to make these requisite showings, the district court 'should take into account when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest' ... While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a 'delicate balancing' of all elements.

*Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 136 (3d Cir), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980) (quoting *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (3d Cir.1978)); *A.O. Smith v. FTC,* 530 F.2d 515 (3d Cir.1976).

Applying these factors to the instant case, Revlon has not shown, as previously discussed, that there is a reasonable probability that the Pantry Pride Group has violated Sections 14(d) and 14(e) of the Exchange Act, Section 7 of the Exchange Act and Regulations G, U and X thereunder, or 18 U.S.C. § 1962 (RICO).

Further, Revlon has not shown, as previously discussed, that there is a reasonable probability that Chemical has violated Section 7 of the Exchange Act and Regulation U thereunder.

Therefore, Revlon's Motion for a Preliminary Injunction is denied.